[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-11264

_____

D.C. Docket No. 1:12-cv-22993-JEM

LEON F. HARRIGAN,

Plaintiff - Appellant,

versus

METRO DADE POLICE DEPARTMENT STATION #4,
(Officer Shooter) Unknown, et al.,

Defendants,

ERNESTO RODRIGUEZ,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 13, 2020)

Before WILSON, MARCUS and THAPAR,[*] Circuit Judges.

MARCUS, Circuit Judge:

This appeal presents the question whether Heck v. Humphrey, 512 U.S. 477 (1994), bars Leon Harrigan's excessive-force claim.  Harrigan sued Ernesto Rodriguez, a Miami-Dade police officer, under 42 U.S.C. § 1983, alleging that Officer Rodriguez shot him without provocation while his truck was stopped at a red light.  Harrigan, though, is presently incarcerated, after a Florida state jury convicted him of aggravated assault and fleeing to elude among other crimes. Rodriguez argues that a successful § 1983 suit would necessarily imply the invalidity of those convictions.  The district court agreed and granted Rodriguez's motion for summary judgment.  But we do not.  We reverse the district court's order and remand for further proceedings consistent with this opinion.

I.

A.

On July 13, 2012, Rodriguez was working the midnight patrol shift along with fellow officers Clifton Baldwin and Brad Carter.  At around 4:45 a.m., as he was driving his patrol car, Officer Carter recognized a black Ford F-250 pickup truck that Rodriguez had identified as stolen several hours earlier.  Harrigan was

---

[*] Honorable Amul R. Thapar, United States Circuit Judge for the Sixth Circuit, sitting by designation.

behind the wheel of the truck.  Carter began to follow Harrigan and radioed for backup.  Officers Rodriguez and Baldwin responded to Carter's call for assistance.

The three officers converged on Harrigan as he was stopped at a red light at the intersection of SW 216th Street and SW 112th Avenue/Allapattah Road in Goulds, Florida.  Harrigan's truck was facing west on SW 216th Street, and Carter pulled up directly behind him.  Rodriguez was heading east on SW 216th Street and stopped his patrol car at the red light on the opposite side of the intersection.  Baldwin was driving north on Allapattah Road and stopped his patrol car in the middle of the intersection, in front of Harrigan's car but far enough away that Harrigan still had room to drive around Baldwin's vehicle.

All three officers then activated their emergency overhead lights.  Carter remained in his patrol car, but Baldwin and Rodriguez got out to investigate and approached Harrigan's truck on foot.  Exactly what happened next, and in what order, is in sharp dispute.  But what is clear is that Officer Rodriguez ultimately fired five shots at Harrigan's truck, and one of them struck Harrigan in the leg.  Harrigan says that Rodriguez started shooting without provocation.[1]  He says that, when Rodriguez opened fire, the truck was stationary.  Only after Rodriguez shot

---

[1] Neither Harrigan nor Officer Rodriguez testified at trial, though Harrigan sat for a deposition in this federal case, and Officer Rodriguez gave a sworn statement to internal investigators following the shooting.

him did Harrigan, fearing for his life, drive off.  And when he did, Harrigan says,

he deliberately swerved to avoid Baldwin in front of him.

Harrigan also relies on testimony from Officer Carter.  Carter first "heard

gunshots" while he was parking his car.  He looked up and "saw the defendant

reverse" before "swerv[ing] around" Officer Baldwin's patrol car.  He testified this

way in a deposition:

> Q: Okay.  So let me make sure I have the sequence accurate.
> You were still putting your car in park when you heard
> gunshots?
>
> A: Yes.  I never got out of my car.
>
> Q: And you were not watching when those shots were fired?
>
> A: No.
>
> Q: It was after you heard the gunshots that you saw the truck in
> front of you go into reverse?
>
> A: Yes.
>
> Q: And it was after you heard the gunshots that you saw the
> truck in front of you swerve around what you believe to be
> Officer Baldwin's car?
>
> A: Yes.
>
> Q: Prior to that, did you ever see the truck in front of you move
> prior to the gunshots?
>
> A: No, because my lights were on.  I thought that he stopped
> and put the car in park, so I was like okay, we are going.  I
> never got out of the car, so I didn't expect any of that to happen.

4

. . .

Q: Did you -- and if you didn't, you answer if you didn't -- but did you hear the truck's engine rev prior to hearing the gunshots?

A: No.  That, I did not.

Q: You didn't hear the truck's tires?

A: No.

Q: First time that you saw or heard the truck moving was after the gunshots?

A: When his car was in reverse[], because I heard first the gunshots that caught my attention.  I looked up, I see the truck back up.  So it backed up.

Q: And that was the first time that you saw the truck moving?

A: Yes.

. . .

Q: Did you ever see that truck strike Officer Baldwin's vehicle?

A: I did not see it.  No.

Q: In fact, what you saw was the truck swerve around Officer Baldwin's car so as not to hit it?

A: Yes.

Officer Rodriguez paints a different picture.  He says that, when he and Officer Baldwin got out of their cars, he heard Harrigan rev the truck's engine before accelerating toward Baldwin, striking the front of his patrol car.  Harrigan

5

then continued to accelerate toward Rodriguez, driving right at him. Only then did Rodriguez, fearing for his life, shoot at Harrigan's truck to disable it. Officer Rodriguez also points us to testimony from Officer Baldwin. Baldwin "was rushing" to the intersection; when he arrived, he "slammed" on his brakes and stopped. He turned his spotlight on and saw Harrigan's eyes "get real big."

Baldwin described the moments that followed like this in a deposition:

> Q: How far away from your car do you get?
>
> A: I started walking, I mean, I started to go around the front of my vehicle and then that's when he accelerated. His engine revved, his tires start spinning and he came at my vehicle and I just ran back.
>
> Q: Did you ever see him put his car in reverse?
>
> A: No, I did not.
>
> Q: Did you ever see his car move backwards at all?
>
> A: No, I did not.
>
> . . .
>
> Q: Okay. Did you see him strike your car, did you see the truck strike your car?
>
> A: I didn't actually physically see the impact, but I saw the vehicle move and I could hear it.
>
> Q: You heard a collision?
>
> A: Yes.
>
> Q: Did you observe damage to your car?

6

A: Yes, I did.

. . .

Q: At what point, when all of these things happened did you hear gunshots?

A: Right as he was passing me I heard gunshots.

Q: After he had passed you?

A: Yeah, he was just clearing me.

Q: Okay.  So it was after you already heard the collision that you heard gunshots?

A: It was after, yes.

All agree that Harrigan then fled the intersection, leading the officers on a high-speed chase for several minutes.  Eventually, Harrigan veered off the road and crashed into a fence.  Harrigan was apprehended and brought to a hospital for treatment of his gunshot wound.

Harrigan was charged and tried in a Florida state court for (1) fleeing to elude a law enforcement officer, in violation of Fla. Stat. § 316.1935(3)(a); (2) reckless driving, in violation of Fla. Stat. § 316.192(1); (3) leaving the scene of an accident involving property damage, in violation of Fla. Stat. § 316.061(1); (4) driving with a suspended license, in violation of Fla Stat. § 322.34(2)(a); (5) resisting an officer without violence, in violation of Fla. Stat. § 843.02; (6) aggravated assault on a law enforcement officer, in violation of Fla. Stat.

§§ 784.021, 784.07, 775.0823; (7) grand theft vehicle, in violation of Fla. Stat.

§ 812.014(2)(c); and (8) criminal mischief, in violation of Fla. Stat. § 806.13(1).

The jury returned general guilty verdicts on all counts.  Harrigan was sentenced to

35 years' imprisonment and remains incarcerated.  Harrigan appealed his

convictions; the Third District Court of Appeal affirmed, see Harrigan v. State, 184

So. 3d 657 (Fla. Dist. Ct. App. 2016), and the Florida Supreme Court denied his

petition for review, see Harrigan v. State, No. SC16-329, 2016 WL 3017712 (Fla.

May 26, 2016).[2]

B.

Harrigan filed this pro se § 1983 action in the United States District Court

for the Southern District of Florida on August 16, 2012, while his criminal case

was pending.  In his initial complaint, Harrigan said he had been the victim of an

"illegal assault and battery" when he was shot in the leg by an unknown Miami-

Dade police officer during the course of a "routine traffic stop" on July 13, 2012.

Harrigan attached a copy of his arrest affidavit to his complaint.  The affidavit

indicated that Harrigan had "eluded police after a police involved shooting," and

---

[2] After exhausting his direct appeals, Harrigan unsuccessfully sought post-conviction relief in
Florida state court.  Harrigan then petitioned the district court for a writ of habeas corpus under
28 U.S.C. § 2254.  The court denied that petition and declined to issue a certificate of
appealability.  Harrigan appealed that order, without success.  While that appeal was pending,
Harrigan moved our Court for leave to file a second or successive petition, which we denied as
premature.  After we denied his motion for a certificate of appealability, Harrigan once more
moved our Court for leave to file a second or successive petition.  We denied the motion in part
and dismissed it in part.

8

that Harrigan "was taken into custody and transported to the hospital" for treatment of a gunshot wound. The district court referred Harrigan's complaint to a magistrate judge for frivolity screening pursuant to 28 U.S.C. § 1915. The magistrate judge thought additional facts were required to determine whether Harrigan could state a colorable excessive-force claim under § 1983 and permitted Harrigan to amend his complaint. Harrigan's amended complaint alleged that Officer Rodriguez "accidentally shot" him while "attempting to disable [his] vehicle." The magistrate judge concluded that the amended complaint remained inadequate because its accusation of an accidental shooting was incompatible with a claim of excessive force. He granted Harrigan one more opportunity to amend his complaint.

Harrigan responded with a second amended complaint in which he claimed that his injuries were caused by Rodriguez's "incompetence" and his "unlawful use of excessive force." The magistrate judge entered a Report and Recommendation advising that the two amended complaints be considered, together, "the operative complaint." The district court adopted that Report and Recommendation.

Officer Rodriguez then moved to dismiss the operative complaint under Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure.[3] He claimed that

---

[3] Rodriguez had previously moved to dismiss Harrigan's second amended complaint for failure to state a claim. The district court denied that motion once it adopted the magistrate judge's recommendation that the two amended complaints be treated together as the operative complaint.

9

Heck v. Humphrey barred Harrigan's claim; that he was entitled to qualified immunity; and that Harrigan had failed to state a claim for which relief could be granted. The magistrate judge issued a Report and Recommendation, concluding that Rodriguez's motion should be denied. He thought Harrigan had stated a viable excessive-force claim and found that the record did not support Rodriguez's claim to qualified immunity. The judge did not, however, address whether Heck barred Harrigan's claim.

The district court adopted the Report and Recommendation and denied Rodriguez's motion to dismiss. It agreed that Harrigan had stated a claim for which relief could be granted, and that the record did not establish Rodriguez's entitlement to qualified immunity. The court also held that Heck did not bar Harrigan's claim because it was "possible for [Harrigan to] prove the factual allegations in the [operative complaint] without undermining his state court convictions."

Officer Rodriguez filed an interlocutory appeal of the district court's order, and, in an unpublished decision, we affirmed in part and dismissed in part. See Harrigan v. Metro Dade Police Dep't Station No. 4, 636 F. App'x 470 (11th Cir. 2015) (per curiam). We agreed that the record did not support Rodriguez's claim to qualified immunity. Id. at 474–75. And we determined that the Court lacked

jurisdiction to review the district court's <u>Heck</u> ruling on an interlocutory basis.  <u>Id.</u> at 476.

Back in district court, both Harrigan and Rodriguez filed motions for summary judgment.  Rodriguez claimed again that <u>Heck</u> barred Harrigan from pursuing his § 1983 claim, since "a judgment in [Harrigan's] favor would necessarily imply the invalidity" of his state-court convictions. Rodriguez also asserted that he was entitled to qualified immunity.  The magistrate judge issued still another Report and Recommendation (the "R & R") finding that <u>Heck</u> barred Harrigan's claim.  Harrigan, the judge determined, had based his excessive-force claim on the following facts: "that Harrigan was shot by Officer Rodriguez without provocation while stopped at [a] red light, and that he then accelerated [his] truck and deliberately swerved around Officer Baldwin and fled the intersection in order to protect his own life."  Those facts, "if proven," would "undermine the validity of Harrigan's convictions for aggravated assault" and fleeing to elude.  Thus, <u>Heck</u> barred Harrigan's claim "because if his version of events were found to be true, it would show that he was wrongly convicted."

Because the magistrate judge found that <u>Heck</u> barred Harrigan's claim, he concluded he lacked jurisdiction over Rodriguez's claim of qualified immunity.[4]

---

[4] The magistrate judge may have erred in this respect.  Though we have said in dicta that <u>Heck</u> strips a federal court of jurisdiction, <u>see</u> <u>Dixon v. Hodges</u>, 887 F.3d 1235, 1237 (11th Cir. 2018) (per curiam), we have more recently called that proposition into serious doubt.  <u>See</u> <u>Teagan v.</u>

11

The district court entered an order adopting the R & R.  This timely appeal followed.

## II.

We first confront a threshold question: whether Harrigan has waived this appeal by failing to object to the R & R.  We conclude that he has not.  Under our Circuit's Rule 3-1, a party who fails to object to a magistrate judge's report and recommendation "waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions."  11th Cir. R. 3-1.  The parties agree that Harrigan did not object to the R & R, even after the district court extended his time to do so.

But that is not the end of the matter.  As we have recognized, Rule 3-1 bars an appeal <u>only</u> when the party who failed to object "was informed of the time period for objecting and the consequences on appeal for failing to" do so.  <u>Id.</u>; <u>see also</u> <u>Evans v. Ga. Reg'l Hosp.</u>, 850 F.3d 1248, 1257 (11th Cir. 2017) (explaining that a party who fails to object waives the right to appeal, "<u>provided</u> the party was given proper notice of the objection time period and the consequences of failing to do so" (emphasis added)), <u>abrogated on other grounds by</u> <u>Bostock v. Clayton</u>

<u>City of McDonough</u>, 949 F.3d 670, 678 (11th Cir. 2020) (per curiam) ("[T]he Supreme Court's own language suggests that <u>Heck</u> deprives the plaintiff of a cause of action -- not that it deprives a court of jurisdiction.").  Since we hold that <u>Heck</u> does not bar Harrigan's claim, we have no occasion to consider whether <u>Heck</u> is a jurisdictional ruling or whether it just deprives a plaintiff of a cause of action.

County, 140 S. Ct. 1731, 1754 (2020). To that end, we require a magistrate judge to provide "clear notice" that failure to object "waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3 IOP ¶ 3.

In this case, the R & R did not advise Harrigan of all of the consequences that would attach to his failure to object. The R & R informed Harrigan that, should he object "to this recommendation or anything in it," he had fourteen days to "file specific written objections" with the clerk of the district court. The R & R said that Harrigan's failure to do so would "bar an attack, on appeal, of the factual findings of the Magistrate Judge." But the R & R said nothing about whether Harrigan's failure to object would also waive his right to challenge on appeal the legal conclusion that Heck barred his claim.

Notably, the R & R's warning in this case tracked our Court's previous treatment of a party's failure to object to a report and recommendation. Before we adopted Rule 3-1, a party's "failure to object limit[ed] the scope of our appellate review to plain error review of the magistrate judge's factual findings." Dupree v. Warden, 715 F.3d 1295, 1300 (11th Cir. 2013) (emphasis in original). "The failure to object to the magistrate judge's legal conclusions," however, did "not preclude the party from challenging those conclusions on appeal." Id. (emphasis in

13

original).  And if a party did challenge those legal conclusions on appeal, our review was de novo.  Id.

The R & R cited two cases from this Court in support of its notice: Lewis v. Smith, 855 F.2d 736 (11th Cir. 1988) (per curiam), and Nettles v. Wainwright, 677 F.2d 404 (5th Cir. Unit B 1982) (en banc).  Those cases, which predate by more than two decades (Nettles, by more than three) our adoption of Rule 3-1, typify our old approach.  They hold that a party who fails to object to a magistrate judge's findings of fact cannot challenge that fact-finding on appeal.  See Lewis, 855 F.2d at 738 ("Failure to object to the magistrate judge's factual findings after notice precludes a later attack on these findings."); Nettles, 677 F.2d at 410 (holding that a party's failure to object "shall bar the party from attacking on appeal factual findings accepted or adopted by the district court except upon grounds of plain error or manifest injustice").  But those cases did not inform Harrigan that his failure to object to the magistrate judge's legal conclusion would waive his right to appeal.

Because the R & R did not inform Harrigan of all of "the consequences on appeal for failing to object," see 11th Cir. R. 3-1, Harrigan has not waived this appeal.[5]

_____

[5] The magistrate judge has issued six Reports and Recommendations in this case.  The first five -- all of which predated our adoption of Rule 3-1 on December 1, 2014 -- said only that objections "may be filed with the District Judge within fourteen days of receipt of a copy of the report."

III.

We turn then to the merits.  We review the district court's grant of summary judgment de novo, drawing all facts and inferences in the light most favorable to Harrigan.  Dyer v. Lee, 488 F.3d 876, 878 (11th Cir. 2007).  Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Because Harrigan proceeded pro se in the district court, we liberally construe his pleadings.[6] Sconiers v. Lockhart, 946 F.3d 1256, 1262 (11th Cir. 2020).

In Heck v. Humphrey, the Supreme Court sought to "avoid the problem inherent in two potentially conflicting resolutions arising out of the same set of events by foreclosing collateral attacks on convictions through the vehicle of a § 1983 suit."  McClish v. Nugent, 483 F.3d 1231, 1250 (11th Cir. 2007).  Thus, Heck bars a state prisoner's suit seeking damages under § 1983 when success "would necessarily imply the invalidity of his conviction or sentence."  512 U.S. at 487.  When "judgment in favor of a prisoner in a § 1983 case would have this effect," the district court "must dismiss the complaint unless the prisoner can show that the related state conviction has already been invalidated."  Sconiers, 946 F.3d at 1268.  The "rule is based on the hoary principle that civil tort actions are not

---

[6] We appointed counsel to represent Harrigan on appeal.  We acknowledge and appreciate counsel's efforts on behalf of his client.

15

appropriate vehicles for challenging the validity of outstanding criminal judgments." Henley v. Payne, 945 F.3d 1320, 1327 (11th Cir. 2019) (quotation omitted). But "if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed." Heck, 512 U.S. at 487 (emphasis in original).

Our Court's Heck inquiry sounds in theoretical possibility. See Hadley v. Gutierrez, 526 F.3d 1324, 1331 (11th Cir. 2008). We first explicated the proper analysis in Dyer v. Lee. There, we explained the concept of "logical necessity," which "is at the heart of the Heck opinion." Dyer, 488 F.3d at 879. This "emphasis on logical necessity," we said, was "a result of the Court's underlying concern in Heck: that § 1983 and the federal habeas corpus statute, 28 U.S.C. § 2254, were 'on a collision course.'" Id. at 880 (quoting Heck, 512 U.S. at 492 (Souter, J., concurring)). That "concern simply does not arise unless there is a necessary logical connection between a successful § 1983 suit and the negation of the underlying conviction." Id. (emphasis in original). Otherwise, there is no "specter of an end-run around habeas," nor is there any "problem of two inconsistent judgments arising out of the same set of facts." Id.

Thus, we held in Dyer that "for Heck to apply, it must be the case that a successful § 1983 suit and the underlying conviction be logically contradictory."

16

Id. at 884. "In other words, as long as it is possible that a § 1983 suit would not negate the underlying conviction, then the suit is not Heck-barred." Id. at 879–80 (emphasis added). In this Circuit, we ask whether "it is possible that the facts could allow a successful § 1983 suit and the underlying conviction both to stand without contradicting each other." Id. at 881 (emphasis added). Heck does not stand in the way of a § 1983 suit if, following the suit's success, "there would still exist a construction of the facts that would allow the underlying conviction to stand." Id. at 880. We reaffirmed this understanding in Dixon v. Hodges, 887 F.3d 1235, 1238 (11th Cir. 2018) (per curiam) ("As long as it is possible that a § 1983 suit would not negate the underlying punishment, then the suit in not Heck-barred." (alterations adopted and emphasis added) (quotation omitted)). Most recently, in Sconiers v. Lockhart, we explained that "when the facts required for a prisoner to prove his § 1983 case do not necessarily logically contradict the essential facts underlying the prisoner's conviction, Heck does not bar the § 1983 action from proceeding." 946 F.3d at 1268.

The Supreme Court has explained that it was "careful in Heck to stress the importance of the term 'necessarily.'" Skinner v. Switzer, 562 U.S. 521, 534 (2011) (quoting Nelson v. Campbell, 541 U.S. 637, 647 (2004)). The United States Court of Appeals for the Sixth Circuit, too, has explained that the "word 'necessarily' must not be ignored." Hill v. Snyder, 878 F.3d 193, 207 (6th Cir.

17

2017). If "invalidation of a conviction or speedier release would not automatically flow from success on the § 1983 claim," that Court has said, "then the Heck doctrine is inapplicable." Id.; see also Smith v. City of Hemet, 394 F.3d 689, 699 (9th Cir. 2005) (en banc) ("As we have explained, a § 1983 action is not barred under Heck unless it is clear from the record that its successful prosecution would necessarily imply or demonstrate that the plaintiff's earlier conviction was invalid." (emphasis in original)). Dictionaries confirm this intuitive understanding of "necessarily." They tell us the word means "unavoidably" or "by logical necessity"; "intrinsically, inherently, inevitably." See Necessarily, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/necessarily (last visited Oct. 12, 2020); Necessarily, Oxford English Dictionary (3d ed. 2003).

Applying these principles to the facts at hand, we conclude that Heck does not bar Harrigan's suit. Officer Rodriguez focuses on just two of Harrigan's state-court convictions -- for aggravated assault and fleeing to elude, conceding as he must that Harrigan's remaining convictions could not be negated if his § 1983 action were to succeed. Rodriguez says that Harrigan's § 1983 claim "is directly at odds with" those two convictions and that Harrigan's "version of events, if proven to be true at trial, would show that" he "was wrongly convicted." Harrigan's essential claim in this excessive-force suit is that Officer Rodriguez shot him while he was sitting "stationary" in his vehicle, stopped at a red light. He claims that "it

18

was only after being shot by Officer Rodriguez that [he] then accelerated [his] vehicle." Thus, the shooting was unprovoked and without any justification. Nothing in the record before us "irrefutably" contradicts that claim; the fact is that "both [Rodriguez's] excessive use of force and" Harrigan's convictions "are not a logical impossibility." Sconiers, 946 F.3d at 1270. As we see it, a jury could have found that Officer Rodriguez shot Harrigan first, and that Harrigan then committed aggravated assault and fled the scene.

The jury could have found the following: Officers Carter, Baldwin, and Rodriguez stopped Harrigan at the intersection of SW 216th Street and Allapattah Road. The vehicle was stationary at a red light. Officers Baldwin and Rodriguez got out of their police cars and approached Harrigan as he sat in the stolen Ford pickup truck. Without provocation, Officer Rodriguez opened fire. Then, and only then, did Harrigan drive his truck at Officer Baldwin before fleeing the intersection and leading the officers on a high-speed chase. That finding would be consistent with the jury's general guilty verdicts for aggravated assault and fleeing to elude. And, under this set of facts, a federal jury still could find for Harrigan on his § 1983 claim without undermining -- much less negating -- his aggravated-assault and fleeing-to-elude convictions. The "facts required for" Harrigan "to prove his § 1983 case do not necessarily logically contradict the essential facts underlying" those convictions, and that means "Heck does not bar the § 1983

19

action from proceeding." Id. at 1268; see also Hunter v. City of Leeds, 941 F.3d 1265, 1276 n.12 (11th Cir. 2019) ("Because it is logically possible that Hunter pointed his gun at Kirk, and that Kirk nonetheless used excessive force in response, the Heck bar does not apply."); Hadley, 526 F.3d at 1331 (concluding there was "no Heck bar" because there was a "version of [the] facts" that made it "theoretically possible" for the state prisoner's § 1983 suit and his underlying conviction to coexist (emphasis added)).

A review of the elements necessary to sustain aggravated-assault and fleeing-to-elude convictions yields the same answer. See Henley, 945 F.3d at 1329 (observing that a plaintiff's success in his § 1983 suit "would not negate any element of his offenses of conviction"). The state trial court instructed the jury that, in order to convict Harrigan of aggravated assault on Officer Baldwin, it must find beyond a reasonable doubt that (1) Harrigan "intentionally and unlawfully threatened, either by word or act, to do violence to" Officer Baldwin; (2) at the time, Harrigan "appeared to have the ability to carry out the threat"; (3) Harrigan "created in the mind of" Officer Baldwin "a well-founded fear that the violence was about to take place"; (4) the "assault was made with a deadly weapon"; (5) Officer Baldwin "was at the time a law enforcement officer"; (6) Harrigan knew Officer Baldwin was a law enforcement officer; and (7) at the time of the assault, Officer Baldwin "was engaged in the lawful performance of his duties."

20

The court also instructed the jury that, in order to convict Harrigan of fleeing to elude, it must find beyond a reasonable doubt that (1) Harrigan "was operating a vehicle upon a street or highway in Florida"; (2) Harrigan, "knowing he had been directed to stop by a duly authorized law enforcement officer, willfully fled in a vehicle in an attempt to elude a law enforcement officer"; (3) the "law enforcement officer was in an authorized law enforcement patrol vehicle with agency insignia and other jurisdictional markings prominently displayed on the vehicle and with siren and lights activated"; and (4) during the flight, Harrigan "drove at high speed or in any manner demonstrating a wanton disregard for the safety of persons or property." Reviewing the elements of each of these crimes, we can discern no necessary conflict; Harrigan's success in his § 1983 suit would not necessarily "negate" any "element" of the crimes "of which he has been convicted." Heck, 512 U.S. at 486 n.6; see also McClish, 483 F.3d at 1250–51.

That Harrigan presented -- and the jury rejected -- a necessity defense is not to the contrary. During closing argument, Harrigan's counsel told the jury that Harrigan fled the intersection of SW 216th Street and Allapattah Road "for one reason, and one reason only" -- Officer Rodriguez shot him, and Harrigan "was reasonably scared that he was going to get shot again. That his life was in danger.

21

That it was a necessity for him to drive[] away, so he wouldn't get killed."[7]  The state court submitted this necessity defense to the jury, explaining that it could acquit Harrigan of the crimes of aggravated assault and fleeing to elude if it found that Harrigan "acted out of necessity."  Since the jury didn't buy the necessity defense, the argument goes, it must have disbelieved Harrigan's claim that Officer Rodriguez shot him without provocation.

We remain unconvinced because the jury's general guilty verdicts for aggravated assault and flight tell us only that it rejected Harrigan's necessity defense.  They tell us nothing more.  The state court instructed the jury that, in order to find Harrigan not guilty by reason of necessity, it would have to find each of the following six elements: that (1) Harrigan "reasonably believed a danger existed which" he did "not intentionally" cause; (2) the "danger threatened significant harm to" Harrigan; (3) the "threatened harm must have been real, imminent, and impending"; (4) Harrigan "had no reasonable means to avoid the danger except by committing the crimes"; (5) Harrigan committed these crimes "out of necessity to avoid the danger"; and (6) the harm Harrigan "avoided must outweigh the harm" he "caused by committing these crimes."

---

[7] Harrigan represented himself at trial; the jury heard from his counsel for "the first time" during closing argument.

22

Officer Rodriguez may be right.  Perhaps the jury rejected Harrigan's necessity defense because it concluded that Rodriguez shot Harrigan only after Harrigan gunned his truck at Officer Baldwin.  But because the jury returned general verdicts, we don't know that for certain.  Cf. Willingham v. Loughnan, 261 F.3d 1178, 1183 (11th Cir. 2001) ("Because the verdicts in both the criminal-trial and this case are general verdicts, the specific facts found by the juries are not available to us."), cert. granted, judgment vacated, and remanded, 537 U.S. 801 (2002).  Perhaps the jury rejected Harrigan's necessity defense for a different reason.  Maybe it thought Harrigan had intentionally caused the danger that existed -- after all, Harrigan's encounter with police officers began because he had stolen a truck.  The jury could have believed that Officer Rodriguez shot Harrigan; that Harrigan then committed aggravated assault and fled the scene; and that Harrigan was not entitled to the necessity defense he sought.  That "construction of the facts" allows for Harrigan's success in his § 1983 suit without undermining his "underlying conviction[s]."  Dyer, 488 F.3d at 880.  The long and short of it is that the jury's rejection of Harrigan's necessity defense does not "necessarily" bring his § 1983 suit within Heck's grasp.

Finally, Officer Rodriguez invokes what we've called the "inconsistent-factual-allegations rule."  Dixon, 887 F.3d at 1238.  He says that Heck bars Harrigan's § 1983 claim because Harrigan's "complaint makes specific factual

23

allegations that are inconsistent with the facts upon which his punishment was based." Id. (alteration adopted) (quotation omitted).  As we've explained, the inconsistent-factual-allegations rule on which Rodriguez relies -- itself "an additional gloss on the Heck analysis," id. at 1239 (quotation omitted) -- applies only in a "narrow category of cases": "where the allegation in the § 1983 complaint is a specific one that both necessarily implies the earlier decision is invalid and is necessary to the success of the § 1983 suit itself." Id. (emphasis in original).  "When a plaintiff alleges a fact that, if true, would conflict with the earlier punishment, but that fact is not necessary to the success of his § 1983 suit, the Heck bar does not apply." Id.  It still remains true that a trial jury could sustain Harrigan's excessive-force § 1983 complaint without negating his state-court convictions.

We reached a similar result in Dixon.  There, a panel of this Court considered whether Heck barred a state prisoner's claim that he suffered excessive force at the hands of a correctional officer. Id. at 1237.  The plaintiff, Dixon, claimed that he went to the prison's officers' station to report that his handicapped cellmate could not reach the top bunk he'd been assigned. Id.  One of the officers at the station, Officer Pollock, began to shout at Dixon.  Dixon alleged that, after he "turned to leave," Pollock tripped him, picked him up off the cement floor and slammed him down, and then proceeded to kick him for two minutes in the face

24

and body.  Id.  For his part, Pollock said that he used only "appropriate force in a manner necessary to subdue Dixon."  Id.  He said that Dixon had ignored repeated requests to leave the officers' station and that, after Dixon turned to leave, "he made a fist with his hand and turned back to lunge at Pollock."  Id.  For his role in the incident, Dixon "was found guilty" of "one charge of Battery or Attempted Battery on a Correctional Officer."  Id. at 1238.

The law enforcement officer argued that Heck compelled dismissal of the lawsuit.  In Dixon, as here, the officer relied on the inconsistent-factual-allegations rule.  In his complaint, Dixon alleged "that he did not lunge at Pollock before Pollock used force against him."  Id.  "Because Dixon's disciplinary punishment [was] grounded in those facts," the argument went, "Heck should bar the suit."  Id. We were not convinced.  We explained that the "gravamen" of the plaintiff's § 1983 complaint was that the officer "used excessive force against him," and that the success of that claim was "not necessarily dependent on whether Dixon lunged at Pollock or not."  Id. at 1239.  Though Dixon's disciplinary punishment established he had, in fact, lunged at Pollock, that was "not determinative of whether Pollock used excessive force against Dixon."  Id. at 1240.  We concluded this way: "It is logically possible both that Dixon lunged at Pollock and that Pollock used excessive force against him.  Because there is a version of the facts

25

which would allow the punishment to stand alongside a successful § 1983 suit, Heck does not control." Id. (alteration adopted) (quotation omitted).

So too here. Harrigan says that, after Officer Rodriguez began shooting at him, Harrigan "backed up" before deliberately swerving around Officer Baldwin in front of him. Though this claim is inconsistent with Harrigan's conviction for aggravated assault on Officer Baldwin, the claim is not necessary to the success of Harrigan's § 1983 suit. As in Dixon, the gravamen of Harrigan's lawsuit is that Officer Rodriguez used excessive force by shooting him without provocation. Whether Harrigan intentionally threatened to harm Officer Baldwin or tried only to avoid him -- and we know from his conviction that the former is true -- does not answer whether Officer Rodriguez used excessive force. That Harrigan committed aggravated assault on Officer Baldwin does not necessarily doom his § 1983 claim.

The entry of a judgment in Harrigan's favor on his § 1983 excessive-force suit would not necessarily imply the invalidity of his state-court convictions. That means Heck does not bar Harrigan's lawsuit, and the district court's conclusion that it does was error. Thus, we reverse the entry of summary judgment for Officer Rodriguez and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**