[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-16194

_____

D.C. Docket No. 1:15-cr-20923-UU-1


UNITED STATES OF AMERICA,

                                                          Plaintiff-Appellee,

versus

LANCE CANNON,
VINCENT HOLTON,

                                                          Defendants-Appellants.


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(February 3, 2021)

Before WILLIAM PRYOR, Chief Judge, HULL and MARCUS, Circuit Judges.

HULL, Circuit Judge:

    After a jury trial, Lance Cannon and Vincent Holton appeal their convictions

for conspiracy to commit Hobbs Act robbery, conspiracy to possess with intent to

distribute cocaine, using and carrying a firearm during a crime of violence and a drug trafficking crime, and possession of a firearm by a convicted felon. Cannon and Holton, bringing guns with them, participated in a plan to rob a stash house containing 18 kilograms of cocaine. As it turns out, one participant was an undercover detective and the stash house was fake. On appeal, Cannon and Holton raise multiple issues as to their convictions. After careful review, and with the benefit of oral argument, we affirm.

## I.  FACTS

The trial evidence included witness testimony as well as audio, and in some cases video, recordings of seven meetings as detailed below.

### A.    June and July 2015 Meetings

The Drug Enforcement Administration ("DEA") encountered Cannon and Holton through its investigation of a target named Owen Nunez. The DEA opened its investigation into Nunez based on information supplied by a confidential informant ("CI") named Miguel Gonzalez, who knew Nunez was a drug dealer. Gonzalez had prior felony convictions, made a living as a CI, and worked for multiple federal law enforcement agencies.

The DEA arranged for the CI to meet Nunez on June 22, 2015, to discuss future drug transactions. On his own initiative, Nunez invited two other individuals—Cannon and an unknown associate. During the meeting, Cannon

discussed with the CI Gonzalez the potential sale of 30 kilograms of cocaine at a price of $28,000 per kilogram. Cannon offered the CI the opportunity to sample the product.

On June 24, 2015, Nunez, Cannon, and the CI Gonzalez met again to discuss the drug deal. This time, Cannon brought Holton with him. Cannon introduced Holton as someone who could transport drugs for the CI if needed, stating, "wherever you want it to go, he drives." Cannon also told the CI: "Anything let me tell you something you ever need . . . come, come to me." Cannon indicated he was talking about transportation. Cannon also said that the CI could come to him if anybody ever "play[ed] with [him]"—that is, interfered with his drug dealings— or was "fucking with [his] shit." Cannon confirmed that the cocaine price was $28,000 per kilogram.

On July 16, 2015, the CI met again with Nunez, Cannon, and Holton. The CI asked Cannon and Holton for a one-kilogram sample of the cocaine prior to the deal because the CI was going to be carrying so much money and wanted to "feel . . . safe." Holton offered to bring "everything to . . . the place," but the CI indicated he just wanted a one-kilogram sample. Later, Cannon and Holton had to "do the math" on 30 kilograms of cocaine at $28,000 per kilogram, which came out to $840,000. After Cannon and Holton left the meeting, the CI told Nunez "these people are liars" and said he had a "bad feeling" about the transaction.

3

After the third meeting, the DEA stopped investigating Cannon and Holton based on "red flags" indicating they were going to rob the CI. One red flag was that Cannon and Holton did not seem to know how much money they were to receive as a result of the drug deal.

## B.    October 23 and 28, 2015 Meetings

Subsequently, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") took over the investigation from the DEA. The CI informed the ATF that Cannon was interested in committing a home invasion robbery for drugs. The CI had placed a series of recorded phone calls to Cannon and prefaced some by noting for law enforcement that the ensuing call would concern a cocaine robbery. During the calls, however, the CI did not specifically mention a robbery to Cannon. Instead, the CI referred to the need to talk soon about a potential job and the possibility of working together.

After receiving the CI's tip that Cannon was interested in committing a robbery, the ATF arranged for a meeting on October 23, 2015, between Cannon, the CI, and Kenneth Veloz—an undercover ("UC") detective with the Miami-Dade Police Department and ATF task force officer. The October 23 meeting took place in a restaurant parking lot. The CI introduced the UC detective to Cannon as his godson. The UC presented himself as a disgruntled drug courier who was not being paid what he was owed. The UC proposed to Cannon stealing 10 to 20

4

kilograms of cocaine from his employers' stash house. Cannon said he had a "team" that could assist with the job.

The UC detective informed Cannon that at least one of the stash house guards was "always strapped," or armed, and warned Cannon that guns would be involved. Cannon discussed with the CI the need to meet after the robbery to split up the stolen cocaine. When the UC detective expressed concern that the stash house guards would not "give up just like that," Cannon promised the UC that the guards were going to "lay the fuck down . . . [o]ne way or another." The UC asked Cannon if he had the "gear," meaning the weapons and equipment necessary to do the robbery, and Cannon told him not to worry.

On October 28, 2015, Cannon met again with the CI Gonzalez and the UC detective. Holton also attended. The UC detective explained that his employers were paying him only half of what he was owed. Holton then asked why he had waited so long to rob them. Holton suggested that the robbery would look better and go more smoothly if the UC was "tak[en] down too," as if he was one of the guards.

Holton asked whether the guard who would open the door for the UC detective would be "strapped." The UC responded that it depended, but that this individual would not have a weapon in his hand. Holton said that if the individual reached for a weapon, he and Cannon would have to protect each other's lives, but

5

that he would prefer to "keep it clean" and "leave smelling like a rose." Holton also expressed that this was not a new situation for him and that he had more than 20 years' experience.

Later, the UC detective indicated that Cannon and Holton should tell him if the robbery was something they could not handle. Holton responded that it was a "simple job" because the UC had "inside info." Holton also said it was an "easy" job but only if it was "worth it," and he asked the UC what "the take" was. The UC told him there would be 10 to 20 kilograms of high-quality, pure cocaine.

The parties then discussed certain logistics. Holton told the UC detective he would need to give him a sign when it was time to rush the door. The UC indicated he would put his glasses up. Holton said he would enter first and throw the UC out of the way, with Cannon following behind. Cannon added that he would aim his gun at the UC. The UC offered to provide Cannon and Holton a van with a trap door in it. Holton suggested that he and Cannon arrive at the robbery dressed as DEA agents and that this was "the best way to do it." Holton later asked the UC if he had any "clean tools"—guns not previously used in a crime. The UC said he did not deal with guns, to which Holton responded, "[w]e got it."

Holton indicated that after the robbery he wanted to quickly unload the stolen cocaine and dump his gun. Cannon told the UC: "[T]he only thing my mind [is] focused on, is making sure you go in smelling like a rose and you come out

6

[the same]—that's my job." Cannon said that he and Holton would "take care of everything else." Cannon and Holton added that if the UC at any point felt threatened, they would "just go ahead and handle that problem."

## C.    November 5, 2015 Meeting

On November 5, 2015, Cannon, Holton, the CI, and the UC detective met again and continued going over the logistics of the robbery. Holton indicated that he and Cannon might want to use the van the UC had proposed. Holton discussed with the UC the possibility that there might be more drugs in the stash house than the UC planned to pick up from his employers. If that was the case, Holton said, they were going to "take all of that shit," but split everything fifty-fifty with the UC. The UC again indicated that at least one guard would be armed. Cannon responded they would take it as if everyone was "strapped." The UC asked Cannon and Holton if they were good with the plan and said it was "no sweat" if they could not handle it. Holton laughed and said if things did not look good, they would let the UC go about his business.

Holton then stated that he and Cannon would wait in a "blind spot" while the UC went to the door of the stash house. Holton and Cannon would then quickly follow behind. Holton said that they were going to tie up the guards—and the UC, Cannon added—and take their guns and car keys. Cannon and Holton would do a thorough search of the stash house to make sure they did not miss any cash or

7

drugs.  Holton later stated, "sooner or later I'm [going to] retire from this shit."

Holton also mentioned possibly bringing a third person, a driver, along to the

robbery.

### D.    November 13, 2015 Robbery

On November 13, 2015, the day the robbery was to occur, Cannon, Holton

and an individual named Nathaniel Stubbs met with the CI a final time.  The UC

detective was not present.  The CI confirmed there would be 18 kilograms of

cocaine in the stash house.  The CI offered to take the guns that Cannon and

Holton had brought with them and put them in his vehicle.  But Cannon and

Holton declined the CI's offer.  Cannon, Holton, and Stubbs then followed the CI

in a pickup truck to a warehouse to retrieve the van and proceed to the stash house.

Upon their arrival at this second location, Cannon, Holton, and Stubbs were

arrested.  Two firearms—an AK-47 style rifle and AK-47 style pistol—along with

ammunition and latex gloves were later recovered from Cannon and Holton's

pickup truck.

## II.  PROCEDURAL HISTORY

### A.    Indictment

A federal grand jury returned an indictment against Cannon and Holton,

charging them with: (1) conspiracy to commit Hobbs Act robbery, in violation of

18 U.S.C. § 1951(a) (Count 1); (2) conspiracy to possess with intent to distribute

five or more kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 2); (3) knowingly using and carrying a firearm during and in relation to a crime of violence, as set forth in Count 1, and during and in relation to a drug trafficking crime, as set forth in Count 2, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2 (Count 3); and (4) possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Count 4 as to Cannon, Count 5 as to Holton).[1]

## B.    Pretrial Motions

In 2016, Cannon and Holton jointly filed pretrial motions. First, they filed a discovery motion. They contended that the ATF and Federal Bureau of Investigation ("FBI") targeted persons of color in phony stash house rip offs and this resulted in the U.S. Attorney's Office for the Southern District of Florida "selectively prosecut[ing]" persons of color. Cannon and Holton sought, inter alia, a list of fake stash house robbery cases brought by that particular U.S. Attorney's Office going back ten years, with each defendant's race.

Second, Cannon and Holton filed a motion to dismiss the indictment based on the government's outrageous conduct in creating the fake robbery scheme, in violation of the Fifth Amendment's Due Process Clause.

---

[1] Stubbs was also indicted but later pled guilty and is not a party to this appeal. Stubbs's participation in pretrial proceedings is omitted from the procedural history.

9

Third, Cannon and Holton filed a motion to dismiss the § 924(c) firearm charge in Count 3 to the extent it was based on the predicate offense of conspiracy to commit Hobbs Act robbery. They claimed that Hobbs Act robbery was not a crime of violence under § 924(c)(3)(A)'s elements clause and based on Johnson v. United States, 576 U.S. 591, 597–98, 606, 135 S. Ct. 2551, 2557–58, 2563 (2015), which held that § 924(e)(2)(B)(ii)'s residual clause was unconstitutionally vague.

After a hearing and reviewing some of the recorded meetings, the magistrate judge issued a written report and recommendation (the "Report"). The Report recommended the denial of the motion to dismiss as to the creation of the robbery scheme because Cannon and Holton had not established outrageous government conduct. The magistrate judge found that the recorded meetings and "undisputed facts regarding the subsequent events" showed that: (1) Cannon and Holton exhibited a predisposition to engage in illegal drug transactions; (2) Cannon showed a predisposition for violence when he told the CI to come to him if anyone was "fucking with [his] shit"; (3) neither Cannon nor Holton were initially recruited by the government; (4) Cannon and Holton were offered the opportunity to withdraw from the stash house robbery but declined; and (5) Cannon and Holton were prepared to participate in the robbery by bringing weapons and other equipment to the predetermined meeting location.

10

To the extent the motion to dismiss was based on racial profiling, however, the Report recommended that it be held in abeyance pending the district court's ruling on the related discovery motion.  The magistrate judge also recommended denying the motion to dismiss Count 3 because Hobbs Act robbery qualified as a crime of violence under § 924(c)(3)(B)'s elements clause.

## C.    District Court's Orders

During a calendar call on April 27, 2018, the district court addressed pretrial matters and denied the defendants' discovery motion.  Later, the district court entered an order: (1) adopting the Report; (2) denying the motion to dismiss, to the extent it was based on the government's creating the robbery scheme; and (3) denying the motion to dismiss the Hobbs Act robbery conspiracy predicate in Count 3.  In a separate order, the court denied the motion to dismiss, to the extent it was based on the alleged targeting of minorities, and denied the amended motion for discovery.[2]

## D.    Trial and Verdict

At trial, the government's four witnesses were: (1) Joseph Bryson, the DEA agent who worked as the CI's handler and arranged the meetings between the CI and Nunez; (2) Kenneth Veloz, the UC detective who participated in the meetings

---

[2]The amended discovery motion differed only in that Cannon and Holton narrowed certain discovery requests.

11

about the stash house robbery; (3) Miguel Gonzalez, the CI; and (4) Adrian Halley, a criminal investigator and ATF special agent, who collected the evidence from the defendants' truck at the time of arrest.

The government also introduced the audio and video recordings and written transcripts of all seven in-person meetings. Bryson, Veloz, and Gonzalez testified as to the meaning of certain phrases and terminology and described what was taking place during the recordings.

DEA agent Bryson also testified how the investigation of Nunez had led to Cannon and Holton, who were initially unknown to law enforcement. Bryson explained that the DEA eventually stopped investigating Cannon and Holton because it believed they were going to rob the CI Gonzalez.

During his testimony, UC detective Veloz repeatedly mentioned how he had set out to "paint a violent situation" in describing the stash house robbery to Cannon and Holton, to test whether they had "the desire and the will" to go through with the plan. Veloz testified that: (1) he offered Cannon and Holton several opportunities to opt out of the plan; (2) he did not offer to provide any guns; and (3) the fact Cannon and Holton contemplated bringing a third person to the robbery demonstrated that they, on their own, were actively planning the robbery. On cross-examination, Veloz admitted that he created the stash house robbery scenario, including the armed guards and the amount of cocaine involved,

but not the crime itself. To further show intent, the government introduced Cannon's 2002 drug conviction and Holton's 1993 drug conviction.

Gonzalez testified about the meetings, his background as a CI, and how he earned money in this role. On cross-examination, Gonzalez admitted that it was his idea to present the idea of a stash house robbery to law enforcement because Cannon previously told him that he could "do anything" the CI needed.

Halley, the ATF investigator, testified as to the gloves, firearms, ammunition, and other items recovered from Cannon and Holton's truck.

On the second day of trial, the district court learned that a juror—Tameka Spicer—knew Holton's wife. Spicer explained that she knew Holton's wife because Spicer did her hair "pretty often." Spicer stated that they never discussed Holton or the case and that her ability to be fair and impartial would not be affected. After hearing the parties' arguments, the court dismissed Spicer because of her financial relationship to Holton's wife.

After the government rested, Cannon and Holton moved for a judgment of acquittal, which the district court denied. Cannon and Holton did not present any evidence.

The district court also denied Cannon and Holton's request for an entrapment instruction. The court did give a "theory of defense instruction," that: (1) each defendant claimed he did not possess willful intent to commit a crime; (2)

13

willfulness or knowledge is an element of each crime; and (3) if a defendant did not possess the requisite willful intent to commit a crime, or "you have a reasonable doubt" about whether the defendant had the required intent and willfulness to commit a crime, "you must find the Defendant not guilty."

The jury found Cannon and Holton guilty on all counts. Later, the district court denied Holton's motion for a new trial.

## E.    Sentencing

The district court sentenced both Cannon and Holton to: (1) 240 months' imprisonment on the Hobbs Act robbery conspiracy conviction (Count 1) and drug conspiracy conviction (Count 2), to run concurrently; (2) 120 months' imprisonment on the felon in possession convictions (Count 4 for Cannon and Count 5 for Holton), to run concurrently; and (3) a consecutive 60 months' imprisonment on their § 924(c) firearm convictions (Count 3). This appeal followed.

## III.  DISCOVERY MOTION

On appeal, Holton argues that the district court erred in denying his motion for discovery as to his selective prosecution claim.[3] Our consideration of Holton's discovery motion as to his selective prosecution claim is governed by well-settled

---

[3] We review the denial of discovery on a selective prosecution claim for an abuse of discretion. See United States v. Jordan, 635 F.3d 1181, 1185 (11th Cir. 2011).

14

and binding precedent in United States v. Armstrong, 517 U.S. 456, 116 S. Ct. 1480 (1996), and United States v. Jordan, 635 F.3d 1181 (11th Cir. 2011).

Federal prosecutors have "broad discretion" in enforcing criminal laws and a "presumption of regularity" attaches to their prosecutorial decisions. Armstrong, 517 U.S. at 464, 116 S. Ct. at 1486 (quotation marks omitted). Federal prosecutors have such latitude because they fall within a "special province" of the executive branch and must assist in ensuring the faithful execution of the nation's laws. See id. (quotation marks omitted).

Nevertheless, prosecutorial discretion is subject to "constitutional constraints." Id. (quotation marks omitted). "One of these constraints, imposed by the equal protection component of the Due Process Clause of the Fifth Amendment, is that the decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification." Id. (citations and quotation marks omitted).

Because of the presumption of regularity, a defendant who seeks to establish a claim of selective prosecution in violation of the Constitution carries a "demanding" burden. United States v. Smith, 231 F.3d 800, 807 (11th Cir. 2000) (quoting Armstrong, 517 U.S. at 463, 116 S. Ct. at 1486); Jordan, 635 F.3d at 1188. "[T]o dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present clear evidence to the contrary."

15

Smith, 231 F.3d at 807 (emphasis omitted) (quoting Armstrong, 517 U.S. at 465,

116 S. Ct. at 1486); Jordan, 635 F.3d at 1188.  This requires a showing "that the

federal prosecutorial policy had a discriminatory effect and that it was motivated

by a discriminatory purpose."  Smith, 231 F.3d at 808 (quoting Armstrong, 517

U.S. at 465, 116 S. Ct. at 1487); Jordan, 635 F.3d at 1188.

Discovery on a selective prosecution claim is subject to "a correspondingly

rigorous standard."  Armstrong, 517 U.S. at 468, 116 S. Ct. at 1488.  It requires a

defendant to produce "some evidence tending to show the existence of the essential

elements" of a selective prosecution claim—discriminatory effect and

discriminatory purpose.  Jordan, 635 F.3d at 1188–89 (quoting Armstrong, 517

U.S. at 468, 116 S. Ct. at 1488) (concluding defendant was not entitled to

discovery on selective prosecution claim under Armstrong); United States v.

Quinn, 123 F.3d 1415, 1425–26 (11th Cir. 1997) (same).  To establish

discriminatory purpose, a defendant must show the decisionmaker "selected or

reaffirmed a particular course of action at least in part 'because of,' not merely 'in

spite of,' its adverse effects upon an identifiable group."  Jordan, 635 F.3d at 1188

(quoting Wayte v. United States, 470 U.S. 598, 610, 105 S. Ct. 1524, 1532 (1985)).

To establish discriminatory effect in a race-based selective prosecution

claim, the defendant "must show that similarly situated individuals of a different

race were not prosecuted."  Smith, 231 F.3d at 808 (quoting Armstrong, 517 U.S.

at 465, 116 S. Ct. at 1487); Jordan, 635 F.3d at 1188.  A "similarly situated" person in the selective prosecution analysis is one who engaged in the same type of conduct as the defendant "and against whom the evidence was as strong or stronger than against the defendant."  Smith, 231 F.3d at 810–11 (affirming the denial of motion to dismiss based on selective prosecution where defendants failed to identify similarly situated comparators who engaged in the same type and quantity of voting crimes); United States v. Brantley, 803 F.3d 1265, 1271–73 (11th Cir. 2015) (affirming the denial of motion to dismiss based on selective prosecution where sole comparator's conduct was materially different from defendant's).

Statistical data reflecting the treatment of only one particular group cannot satisfy the discriminatory effect prong because it fails to show that similarly situated persons were treated differently.  For example, in Jordan, this Court affirmed the denial of discovery and an evidentiary hearing on a selective prosecution claim where the defendant's statistics showed that "approximately 93%" of Armed Career Criminal Act ("ACCA") prosecutions in the Northern District of Georgia were against African Americans, but failed to "include the criminal histories of the other defendants."  635 F.3d at 1189.  This Court explained that because the statistics did not touch on the criminal histories of other defendants who were not prosecuted, they were "not probative of the 'similarly situated' inquiry of the discriminatory effect test."  Id.  We pointed out that

17

"Jordan did not show that a single arrestee who was not prosecuted under the ACCA qualified for such prosecution, much less possessed a criminal history as substantial as his own." Id. Therefore, we concluded that Jordan failed to present "'some' evidence tending to establish selective prosecution, much less facts sufficient to create a reasonable doubt about the constitutionality of his prosecution." Id. (quotation marks omitted).

The same was true in Armstrong. There, the Supreme Court held that defendants were not entitled to discovery as to selective prosecution where the defendants provided an affidavit from the Federal Public Defender's office, which said that in all of the 24 relevant cases it had handled in a particular year, all defendants had been black. Armstrong, 517 U.S. at 459, 116 S. Ct. at 1483. This was not sufficient to allow for discovery because the evidence "failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not so prosecuted." Id. at 470, 116 S. Ct. at 1489 (emphasis added).

So too here. Nothing about the evidence that defendants have offered is distinguishable from Armstrong or Jordan. Here, the defendants failed to proffer evidence of discriminatory effect. See Armstrong, 517 U.S. at 470, 116 S. Ct. at 1489; Jordan, 635 F.3d at 1188–89. The only evidence that Cannon and Holton proffered in support of the discovery motion was: (1) a USA Today article

18

reporting that "[a]t least 91% of the people agents have locked up" as a result of stash house stings were racial or ethnic minorities and (2) data from the Federal Public Defender's Miami office showing that out of the 60 cases involving a stash house that the office had handled since 2001, all 87 defendants were either black or Hispanic in 25 cases that employed the same "disgruntled drug courier" scenario as this case.

Under Armstrong and Jordan, this statistical evidence fails to establish discriminatory effect because it does not demonstrate that similarly situated defendants of other races could have been prosecuted for the same offenses but were not.  See Armstrong, 517 U.S. at 470, 116 S. Ct. at 1489; Jordan, 635 F.3d at 1188–89.  The USA Today article and statistics from the Federal Public Defender's office in Miami say nothing about whether the government declined to prosecute similarly situated non-minority individuals in reverse stash house stings.  Furthermore, the statistics from the Federal Public Defender's Miami office cover 25 of the 60 stash house cases that office handled within that district.  Even if those 25 cases represent every reverse stash house sting out of the 60 cases, these statistics do not include similar cases in the district *not* handled by the Federal Public Defender's Miami office—they represent only a "fraction of the total number of prosecutions," as the government puts it.  And even if they did represent every similar case in the district, the statistics would still tell us nothing about

19

similarly situated non-minority individuals. Simply put, telling the court how many minorities <u>have</u> been prosecuted does nothing to prove how many non-minorities <u>have not</u> been. And that similarly situated showing is plainly required under Supreme Court precedent and our own precedent to proceed to discovery. See <u>Armstrong</u>, 517 U.S. at 468, 116 S. Ct. at 1488; <u>Jordan</u>, 635 F.3d at 1188.

Because defendants failed to establish discriminatory effect, we need not address discriminatory purpose. In any event, there is no evidence of discriminatory purpose. Law enforcement did not initially target Cannon and Holton. Instead, they came to law enforcement's attention through the DEA's investigation of Owen Nunez, a drug dealer who brought Cannon to a meeting, and then Cannon brought Holton to a later meeting. The ATF continued the investigation only after Cannon had offered to assist the CI in the future if he needed.

For all these reasons, the district court did not abuse its discretion in denying the defendants' motion for discovery on the claim of selective prosecution.

Before concluding this issue, we recognize that Holton's discovery motion sought information not only from the U.S. Attorney's Office for the Southern District of Florida about the prosecution of racial minorities in fake stash house cases, but also from the ATF and FBI about how defendants were selected or

20

targeted for investigation in such cases.  Holton's motion, however, referred to only "selective prosecution" and never "selective enforcement."

Similarly, on appeal, Holton used only the term "selective prosecution" in his opening and reply briefs.  Holton used the term "selective enforcement" for the first time in this Court in his Rule 28(j) letter.  Even assuming arguendo that Holton adequately raised the issue in the district court, he abandoned it on appeal. See United States v. Levy, 416 F.3d 1273, 1275–76 (11th Cir. 2005) (providing that issues not raised in opening brief are abandoned); United States v. Jernigan, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003) (stating that "a party seeking to raise a claim or issue on appeal must plainly and prominently so indicate," even if issue was preserved at trial).

## IV.  MULTIPLICITOUS INDICTMENT

Holton argues, for the first time on appeal, that the indictment was multiplicitous.[4]  Holton contends he was improperly charged with two conspiracies—one to commit Hobbs Act robbery in Count 1 and another to possess with intent to distribute cocaine in Count 2—when only a single conspiracy occurred.

---

[4] We review this issue for plain error, which requires (1) an error, (2) that is plain, and (3) that affects substantial rights.  See United States v. Gonzalez, 834 F.3d 1206, 1217–18 (11th Cir. 2016).  If these conditions are meet, we may exercise our discretion to correct the error, but only if the error "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings."  Id. at 1218 (quotation marks omitted).

The Double Jeopardy Clause prohibits multiple punishments for the same offense. United States v. Bobb, 577 F.3d 1366, 1371 (11th Cir. 2009). A multiplicitous indictment, which "charges a single offense in more than one count," violates double jeopardy principles "because it gives the jury numerous opportunities to convict the defendant for the same offense." United States v. Williams, 527 F.3d 1235, 1241 (11th Cir. 2008).

"Where the same conduct violates two statutory provisions, the first step in the double jeopardy analysis is to determine whether the legislature . . . intended that each violation be a separate offense." United States v. Davis, 854 F.3d 1276, 1286 (11th Cir. 2017) (quotation marks omitted). If congressional intent is unclear, we apply the Supreme Court's test set forth in Blockburger v. United States, 284 U.S. 299, 52 S. Ct. 180 (1932). Davis, 854 F.3d at 1286. Under Blockburger, "the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Blockburger, 284 U.S. at 304, 52 S. Ct. at 182. In applying the Blockburger test, we examine only the elements of each offense, except in "a few specific circumstances" that are not present here. See United States v. Hassoun, 476 F.3d 1181, 1186–87 (11th Cir. 2007); see also Williams, 527 F.3d at 1240.

Here, Holton failed to show that the indictment was multiplicitous. Neither Holton nor the government identifies anything in the conspiracy statutes or their

22

legislative histories that speaks to Congress's intent to authorize separate and cumulative punishments. We therefore compare the elements of the two offenses. See Davis, 854 F.3d at 1286.

Doing so, we easily conclude the two conspiracy offenses have separate elements. Conspiracy to commit Hobbs Act robbery requires proof that: "(1) two or more persons agreed to commit a robbery encompassed within the Hobbs Act," which prohibits robberies that affect interstate commerce; (2) "the defendant knew of the conspiratorial goal; and (3) the defendant voluntarily participated in helping to accomplish the goal." United States v. Hano, 922 F.3d 1272, 1294 (11th Cir.), cert. denied, ___ U.S. ___, 140 S. Ct. 488 (2019). In contrast, conspiracy to possess with intent to distribute cocaine requires proof that: (1) "an illegal agreement existed to possess with the intent to distribute cocaine;" (2) the defendant knew of the agreement; and (3) the defendant knowingly and voluntarily joined the agreement. United States v. Charles, 313 F.3d 1278, 1284 (11th Cir. 2002) (emphasis omitted). Because each conspiracy requires "proof of a fact which the other does not"—namely, a distinct type of agreement—the Blockburger test is satisfied, and the indictment is not multiplicitous. See Blockburger, 284 U.S. at 304, 52 S. Ct. at 182. Holton has shown no error, much less plain error.

Holton argues that allowing multiple conspiracy prosecutions to stem from a single agreement is contrary to Braverman v. United States, 317 U.S. 49, 63 S. Ct.

23

99 (1942), but that case is materially different.  In <u>Braverman</u>, the Supreme Court held that an agreement to violate multiple internal revenue laws was a single conspiracy, "however diverse its objects," because it violated only one conspiracy statute.  <u>Braverman</u>, 317 U.S. at 54, 63 S. Ct. at 102.  Here, in contrast, defendants were charged with two conspiracies, under separate statutory provisions, which clearly "specify different ends as the proscribed object of the conspiracy."  <u>See</u> <u>Albernaz v. United States</u>, 450 U.S. 333, 339, 101 S. Ct. 1137, 1142 (1981) (concluding that conspiracy to import and conspiracy to distribute marijuana in violation of separate statutory provisions satisfied the <u>Blockburger</u> test).

We also reject Holton's argument that we should apply the "same evidence" test from <u>United States v. Marable</u>, 578 F.2d 151 (5th Cir. 1978).  In <u>Marable</u>, the former Fifth Circuit concluded that a defendant's conviction for conspiracy to distribute cocaine violated double jeopardy because it was based on the same evidence as his prior conviction for conspiracy to distribute heroin, and that the two conspiracies reflected only "a single agreement to deal broadly in drugs."  578 F.2d at 154–56.  <u>Marable</u>, however, was abrogated by the Fifth Circuit's en banc decision in <u>United States v. Rodriguez</u>, which recognized that <u>Blockburger</u> places the focus on the "<u>elements</u> of the offense charged, <u>not on</u> the evidence adduced at

24

trial."  612 F.2d 906, 919 & n.35 (5th Cir. 1980) (en banc),[5] aff'd sub nom.

Albernaz v. United States, 450 U.S. 333, 101 S. Ct. 1137 (1981), overruled on

other grounds by United States v. Michelena-Orovio, 719 F.2d 738, 756–57 (5th

Cir. 1983) (en banc); see also Hassoun, 476 F.3d at 1187 n.7 (recognizing

abrogation).

To the extent Marable retains any precedential value in this Circuit, it is

limited to, "at most, cases in which two counts are charged under the same

conspiracy statute."  Hassoun, 476 F.3d at 1187 n.7; see also United States v.

Anderson, 872 F.2d 1508, 1520 (11th Cir. 1989) (indicating that Marable does not

apply "where the same agreement violates two separate statutes, each of which

proscribes a discrete conspiracy").  Marable is wholly inapplicable because this

case, even with its common facts, still involves two separate conspiracies, one

under 18 U.S.C. § 1951(a) and the other under 21 U.S.C. §§ 841(a)(1) and 846.

## V.  OUTRAGEOUS CONDUCT

Cannon and Holton argue that the creation of the stash house robbery

scheme constituted outrageous government conduct in violation of the Fifth

---

[5]This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Amendment's Due Process Clause, and that the district court erred in denying their motion to dismiss the indictment on this basis.[6]

Outrageous government conduct is a potential defense that "focuses on the tactics employed by law enforcement officials to obtain a conviction for conduct beyond the defendant's predisposition." United States v. Sanchez, 138 F.3d 1410, 1413 (11th Cir. 1998). It is based on the Supreme Court's recognition of the possibility that law enforcement's tactics may be "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." United States v. Russell, 411 U.S. 423, 431–32, 93 S. Ct. 1637, 1643 (1973). To establish outrageous government conduct, a defendant must show that law enforcement's techniques violate "fundamental fairness, shocking to the universal sense of justice, mandated by the Due Process Clause of the Fifth Amendment." See id. at 432, 93 S. Ct. at 1643 (quotation marks omitted).

Our Circuit has caselaw analyzing outrageous government conduct claims, although this defense has never succeeded here or in the Supreme Court. See Sanchez, 138 F.3d at 1413 (stating that "[t]his Court recognizes the defense of outrageous governmental conduct," but noting the standard has never been met in

---

[6]We review de novo the denial of a motion to dismiss based on outrageous government conduct. United States v. Jayyousi, 657 F.3d 1085, 1111 (11th Cir. 2011). We reject the government's claim that Cannon waived this argument by failing to object to the magistrate judge's Report. Because the Report did not fully inform Cannon of the consequences on appeal of failing to object, we review Cannon's claims de novo. See 11th Cir. R. 3-1.

26

this Court or in the Supreme Court); see also United States v. Ciszkowski, 492 F.3d 1264, 1270 (11th Cir. 2007) ("[W]e do recognize the outrageous government conduct defense."). However, the concurring opinion in Ciszkowski, and this Court's later opinion in United States v. Jayyousi, 657 F.3d 1085 (11th Cir. 2011), doubted that the defense is "recognized" in this Court. Both state that because this Court has never actually reversed a conviction based on outrageous government conduct, any discussion of it is merely dicta. See Ciszkowski, 492 F.3d at 1272 (Carnes, J., concurring) (stating that this Court's discussion of the defense is contained only in "speculative dicta"); Jayyousi, 657 F.3d at 1111 ("We have never applied the outrageous government conduct defense and have discussed it only in dicta.").

We need not decide whether to adopt this defense because Cannon and Holton have not shown the government's conduct was outrageous in any event. Merely presenting defendants with a non-unique opportunity to commit a crime, of which they are more than willing to take advantage, does not amount to outrageous government conduct. See United States v. Savage, 701 F.2d 867, 869–70 (11th Cir. 1983). This Court has repeatedly rejected challenges to reverse sting operations, see Sanchez, 138 F.3d at 1413, and noted that they are "recognized and useful methods of law enforcement investigation," Ciszkowski, 492 F.3d at 1271.

27

Taken in its entirety, the government's conduct was not outrageous and did not violate due process. See United States v. Haimowitz, 725 F.2d 1561, 1577 (11th Cir. 1984) (providing that we examine outrageous government conduct under the totality of the circumstances, and no single factor controls). Although the government presented Cannon and Holton with the opportunity to rob a stash house, it did not provide the entire means of executing the plan, and defendants offered much more than their "meager assistance." See United States v. Puett, 735 F.2d 1331, 1335 (11th Cir. 1984) (stating that government conduct may be outrageous "when the government instigates the criminal activity, provides the entire means for its execution, and runs the entire operation with only meager assistance from the defendant"). The government did not initially recruit Cannon or Holton, and it was Cannon who offered to assist the CI in the future if the CI needed. Later, it was Cannon who offered the UC detective a "team" that could assist with the robbery. Notably, Cannon brought Holton into the scheme.

Cannon and Holton also declined multiple opportunities to withdraw from the robbery, were undeterred by the assured presence of armed guards at the stash house, and were willing to provide the know-how and their own guns necessary to carry out the robbery. During the recorded meetings, Holton and Cannon readily filled in the details of the plan, informing the UC detective what they would do before, during, and after the robbery. Under the totality of the circumstances,

28

Holton and Cannon have not shown the government's conduct was outrageous or fundamentally unfair or "shocking to the universal sense of justice." See Russell, 411 U.S. at 432, 93 S. Ct. at 1643 (quotation marks omitted).

To be sure, the government's CI suggested the robbery, and the UC detective invented the idea of a stash house with 18 kilograms of cocaine and armed guards and offered Cannon and Holton a van to use. But this level of involvement does not go beyond merely presenting Cannon and Holton with the opportunity to commit a crime, which does not amount to outrageous conduct. See Savage, 701 F.2d at 869–70.

Cannon and Holton also argue the CI's robbery scheme served no purpose other than to "create crime," given that no drugs were taken off the streets.[7] This argument ignores that the government presented Cannon and Holton only with an opportunity of which they "were more than willing to take advantage." See id. at 869. Under the particular circumstances here, including the defendants' active and willing participation in the scheme, we have no reason to depart from our precedent recognizing reverse stash house stings as lawful methods of

---

[7]While Holton argues that we should apply the six factors articulated by the Ninth Circuit in United States v. Black, 733 F.3d 294, 303 (9th Cir. 2013), the test in this Circuit examines the totality of the circumstances, as discussed and applied above. See Haimowitz, 725 F.2d at 1577. The two California district court decisions the defendants rely on were reversed by the Ninth Circuit. See United States v. Flores, 650 F. App'x 362, 362 (9th Cir. 2016); United States v. Dunlap, 593 F. App'x 619, 620 (9th Cir. 2014).

investigation.  See Ciszkowski, 492 F.3d at 1271; Sanchez, 138 F.3d at 1413.[8]

## VI.  ENTRAPMENT INSTRUCTION

Cannon and Holton challenge the district court's refusal to give an

entrapment instruction.[9]

### A.    Entrapment Defense

Entrapment is an affirmative defense.  United States v. Orisnord, 483 F.3d

1169, 1178 (11th Cir. 2007).  Entrapment has two elements: "(1) government

inducement of the crime and (2) the defendant's lack of predisposition to commit

the crime before the inducement."  Id.

A defendant has the initial burden of production to show the government

induced the defendant to commit the crime.  Id.  To establish inducement, "a

defendant must prove more than that the government first solicited him or merely

provided the opportunity for the crime."  United States v. West, 898 F.2d 1493,

1502 (11th Cir. 1990).  Instead, the defendant must show "an element of

persuasion or mild coercion," in other words, "opportunity plus something like

excessive pressure or manipulation of a non-criminal motive."  See United States

v. Brown, 43 F.3d 618, 623 (11th Cir. 1995).  If the defendant produces sufficient

---

[8]Cannon also argues, for the first time on appeal, that the district court should have dismissed the indictment pursuant to its inherent authority.  There is no basis to conclude that the district court erred, much less plainly erred, in refusing to dismiss the indictment on this ground.

[9]We review de novo a district court's refusal to give an entrapment instruction.  See United States v. Dixon, 901 F.3d 1322, 1346–47 (11th Cir. 2018).

evidence to create jury issues as to inducement, the burden shifts to the government to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime. Orisnord, 483 F.3d at 1178.

The district court did not err in denying the defendants' request for an entrapment instruction. Cannon and Holton failed to present sufficient evidence to create a jury issue on inducement. As explained above, Cannon and Holton without hesitation agreed to rob the stash house and declined multiple opportunities to withdraw. Cannon and Holton planned and informed the UC detective what would happen at each stage of the robbery—from waiting in a blind spot as the UC went to the door, to tying up the guards and searching the house, to Holton dumping his gun when it was all over. On their own, they involved a third person, Nathaniel Stubbs, and never expressed any doubt. There is also no evidence that the government persuaded or coerced Cannon and Holton into committing any of the charged crimes. See Brown, 43 F.3d at 623.

Holton stresses that the government created the robbery scheme, offered to provide transportation, and induced him and Cannon to bring weapons by having the UC detective repeatedly state the guards would be armed. The mere creation of the opportunity to rob the stash house does not show inducement. See West, 898 F.2d at 1502. The facts that Cannon and Holton were offered a van and told armed guards would be at the stash house do not evince "an element of persuasion or mild

31

coercion." See Brown, 43 F.3d at 623.  If anything, that Cannon and Holton were not dissuaded by the armed guards' presence shows they were ready and willing to commit the robbery regardless of the danger.  Indeed, and in any event, the government proved beyond a reasonable doubt the defendants' predisposition to commit the crime.  See Orisnord, 483 F.3d at 1178.

The government points out that Holton and Cannon had the ability to present an effective defense.  The district court gave a theory of defense instruction, which emphasized the mental state required for a conviction.  The court told the jury to find Cannon and Holton guilty only if it concluded that they had the requisite intent or willfulness to commit the crimes charged and the government merely presented them "with the opportunity to do so."  Even without an entrapment instruction, the jury was able to consider whether Cannon and Holton acted with the requisite willful intent to commit a crime.

## B.    Sentencing Entrapment

For the first time on appeal, Cannon raises a sentencing entrapment claim.[10] He argues the government entrapped him into agreeing to rob a greater quantity of drugs than he was predisposed to purchase and that the district court should have

---

[10]Because at trial Cannon did not request an instruction on sentencing entrapment, we review the issue for plain error.  See United States v. Starke, 62 F.3d 1374, 1380 (11th Cir. 1995).

32

given an instruction on sentencing entrapment.

"Sentencing entrapment is the claim that a defendant, although predisposed to commit a minor or lesser offense, is entrapped into committing a greater offense subject to greater punishment." Sanchez, 138 F.3d at 1414 (quotation marks omitted). This Court previously has rejected the viability of sentencing entrapment as a defense. Ciszkowski, 492 F.3d at 1270. Therefore, the district court did not err, much less plainly err, in not giving a sentencing entrapment instruction.

Cannon argues that in light of the Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000), our precedent rejecting the sentencing entrapment defense should be overruled. We disagree. Apprendi has no application to a sentencing entrapment defense.

Even assuming the defense was somehow available, it would be examined "according to those rules applicable to a traditional entrapment defense," which requires the defendant to carry the initial burden of establishing inducement. United States v. Ryan, 289 F.3d 1339, 1343 (11th Cir. 2002). As set forth above, Cannon failed to present sufficient evidence to create a jury issue as to inducement.

## VII. JUROR DISMISSAL

Cannon argues that the district court erred in dismissing Tameka Spicer from the jury because: (1) Spicer said she could be fair and impartial; and (2) no

adequate record was made concerning her financial relationship to Holton's wife.[11]

A district court has the authority to replace with alternates "any jurors who are unable to perform or who are disqualified from performing their duties." Fed. R. Crim. P. 24(c)(1). It is within the district court's sound discretion to remove and replace a juror "whenever facts are presented which convince the trial judge that the juror's ability to perform his duty as a juror is impaired." United States v. Crabtree, 878 F.3d 1274, 1288 (11th Cir. 2018) (quoting United States v. Fajardo, 787 F.2d 1523, 1525 (11th Cir. 1986)).

"We will not disturb a district court's decision to remove a juror before deliberations absent a showing of bias or prejudice, which includes removal without factual support, or for a legally irrelevant reason." United States v. Godwin, 765 F.3d 1306, 1316 (11th Cir. 2014) (quotation marks omitted). The district court need provide only "a reasonable cause" for its decision to replace a juror. Crabtree, 878 F.3d at 1288 (quoting Fajardo, 787 F.2d at 1526). When a juror demonstrates actual bias, or if bias is implied due to a special relationship with a party, removal is required. United States v. Rhodes, 177 F.3d 963, 965 (11th Cir. 1999).

---

[11]We review a district court's decision to dismiss a juror for an abuse of discretion. United States v. Crabtree, 878 F.3d 1274, 1288 (11th Cir. 2018).

The district court did not abuse its discretion in dismissing juror Spicer who knew Holton's wife and styled her hair on a regular basis. It was well within the district court's discretion to conclude that Spicer's relationship to Holton's wife was financial in nature and "too close," and that this created a greater likelihood of her being "influenced by her relationship to . . . Holton's wife." That Spicer told the district court the relationship would not impact her ability to perform her duties does not compel a different conclusion. Despite her statement of no actual bias, the court was still required to determine if there would be implied bias due to the relationship. See Rhodes, 177 F.3d at 965.

Because the court's decision to dismiss Spicer was supported by a factual basis for implied bias and a legally relevant reason, we will not disturb it. See Godwin, 765 F.3d at 1316. Even if the court had somehow violated Rule 24(c), which it did not, Cannon makes no attempt to show that Spicer's replacement prior to deliberations resulted in prejudice requiring reversal. See United States v. Puche, 350 F.3d 1137, 1152–53 (11th Cir. 2003) (stating that reversal is required only when there is a "reasonable possibility" that the Rule 24(c) violation resulted in actual prejudice to the defendants) (quotation marks omitted).

We also reject Cannon's argument that the district court failed to develop the record regarding Spicer's financial ties to Holton's wife. After putting Spicer under oath and establishing the existence of her relationship to Holton's wife, the

35

district court said it was willing to ask additional questions of Spicer and invited both sides to present authorities in support of their positions. Neither Cannon nor Holton requested further questioning or offered caselaw indicating that Spicer's dismissal would be improper. To the contrary, Cannon indicated it was "in all likelihood" within the court's discretion to dismiss Spicer. Spicer's dismissal was not an abuse of discretion.

## VIII. COURT REPORTER ACT

Cannon argues that his right to have all proceedings in open court transcribed was violated. Cannon requests "a new trial or reconstruction of the Records" because he has new counsel on appeal. Cannon cites to the Court Reporter Act, 28 U.S.C. § 753, but fails to explain, what, if anything, was omitted from the record. The government interprets Cannon's sparse argument as challenging the court reporter's failure to transcribe the recorded conversations that were admitted into evidence.

The Court Reporter Act requires "all proceedings in criminal cases had in open court" to be "recorded verbatim by shorthand, mechanical means, electronic sound recording, or any other method, subject to regulations promulgated by the Judicial Conference and subject to the discretion and approval of the judge." 28 U.S.C. § 753(b)(1). We review de novo questions of statutory interpretation. See United States v. Witek, 61 F.3d 819, 821 (11th Cir. 1995).

36

At trial, both the recordings and the corresponding written transcripts of them were admitted into evidence and are part of the record on appeal. The record is complete. The transcripts were admitted as exhibits of the actual conversations on the recordings and no one, then or now, contested their accuracy. Under these circumstances, nothing in the Court Reporter Act requires that the audio or video recordings, which "are not testimony but are themselves admitted into evidence as exhibits," also be transcribed by the court reporter. See United States v. Morales-Madera, 352 F.3d 1, 7 (1st Cir. 2003) (stating, in case involving wiretapped recordings, that "[t]he Court Reporter Act is not usually understood to require the reporter to record separately the contents of exhibits admitted in evidence"); see also United States v. Craig, 573 F.2d 455, 480 (7th Cir. 1977) (concluding there was "substantial compliance" with the Court Reporter Act—even though court reporter did not transcribe tape recordings that were played to the jury—because the recordings were part of the record on appeal, the court had before it "the most accurate record of what was heard by the jury," and appellate review was in no way impeded).

## IX.  FIREARM CONVICTIONS

Cannon and Holton challenge their § 924(c) firearm convictions.

### A.    Background

Section 924(c) prohibits a person from using or carrying a firearm "during

37

and in relation to any crime of violence or drug trafficking crime" or possessing a firearm "in furtherance of any such crime."  18 U.S.C. § 924(c)(1)(A).  Count 3 charged that Cannon and Holton used and carried a firearm during and in relation to a crime of violence (the Hobbs Act robbery conspiracy in Count 1) and a drug trafficking crime (the cocaine conspiracy in Count 2).

Before their 2016 trial, the defendants claimed that Hobbs Act robbery conspiracy was not a crime of violence based on Johnson v. United States, 576 U.S. 591, 135 S. Ct. 2551 (2015), and moved the district court to dismiss that predicate in Count 3.  The district court denied the defendants' motion and submitted Count 3 to the jury with both predicates.

In 2019, while this appeal was pending, the Supreme Court in United States v. Davis invalidated part of § 924(c)'s definition of a crime of violence, the so-called residual clause in § 924(c)(3)(B).  Davis, 588 U.S. ___, 139 S. Ct. 2319, 2324–25, 2336 (2019).  Thus, after Davis, for an offense to qualify as a crime of violence it must satisfy § 924(c)(3)(A)'s elements clause.  Davis did not, however, affect the definition of a drug trafficking crime, which includes "any felony punishable under the Controlled Substances Act."  See 18 U.S.C. § 924(c)(2).

Subsequently, this Court held that Hobbs Act robbery conspiracy does not categorically qualify as a crime of violence under § 924(c)(3)(A)'s elements clause.  See Brown v. United States, 942 F.3d 1069, 1075 (11th Cir. 2019).

38

**B.    Two Predicates in Count 3**

On appeal, the defendants contend that because one of the two predicate crimes in Count 3 is an invalid predicate, their § 924(c) convictions must be vacated.  The defendants do not dispute that the other predicate crime—the cocaine conspiracy in Count 2—qualifies as a "drug trafficking crime" and remains a valid predicate for Count 3.  Even so, they argue that because the jury entered a general verdict, we cannot know if the jury unanimously found their guns connected to the now-invalid Hobbs Act robbery conspiracy predicate or the still-valid cocaine conspiracy predicate.

First, we agree that it was error for the district court to deny the defendants' motion to dismiss the predicate of Hobbs Act robbery conspiracy and to submit that crime as a valid predicate in Count 3 for the jury's consideration.  Although the trial occurred in 2016, the defendants timely raised the issue in the district court and in this direct appeal, and Davis and Brown apply here.  See United States v. Cubelo, 726 F.3d 1260, 1266 (11th Cir. 2013) (explaining that the Supreme Court's new rule applies retroactively on direct appeal if a defendant preserved his objection throughout the trial and appeal process).  Further, it is error to instruct a jury that it can convict on alternative theories of guilt, one of which is invalid. Hedgpeth v. Pulido, 555 U.S. 57, 58, 129 S. Ct. 530, 530 (2008); see also Yates v. United States, 354 U.S. 298, 312, 77 S. Ct. 1064, 1073 (1957), overruled on other

39

grounds by <u>Burks v. United States</u>, 437 U.S. 1, 98 S. Ct. 2141 (1978); <u>Stromberg v. California</u>, 283 U.S. 359, 367-68, 51 S. Ct. 532, 535 (1931).

Nonetheless, the government contends that this error was harmless.[12]  The error here is not structural and is subject to harmless-error review.  <u>See</u> <u>Hedgpeth</u>, 555 U.S. at 61-62, 129 S. Ct. at 532 (holding instructional errors arising in the context of multiple theories of guilt, one of which is invalid, are not structural errors but are errors subject to harmless-error review);[13] <u>see also</u> <u>Skilling v. United States</u>, 561 U.S. 358, 414 & n.46, 130 S. Ct. 2896, 2934 & n.46 (2010).  The government, however, has the burden as to harmless error.  <u>See</u> <u>Neder v. United States</u>, 527 U.S. 1, 15, 119 S. Ct. 1827, 1837 (1999).

The harmless-error test "is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'"  <u>Id.</u> (quoting <u>Chapman v. California</u>, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967)).  Stated another way: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?"  <u>Id.</u> at 18, 119 S. Ct. at

---

[12]Because the defendants in the district court raised the issue of whether Hobbs Act robbery conspiracy qualifies as a crime of violence under § 924(c), we review that issue <u>de novo</u>. <u>See</u> <u>United States v. Bates</u>, 960 F.3d 1278, 1285 (11th Cir. 2020).

[13]In <u>Hedgpeth</u>, the Supreme Court further explained: "Both <u>Stromberg</u> and <u>Yates</u> were decided before we concluded in <u>Chapman v. California</u> that constitutional errors can be harmless.  Accordingly, neither <u>Stromberg</u> nor <u>Yates</u> had reason to address whether the instructional errors they identified could be reviewed for harmlessness, or instead required automatic reversal."  555 U.S. at 60, 129 S. Ct. at 532 (citation omitted).

1838; see also Delaware v. Van Arsdall, 475 U.S. 673, 681, 106 S. Ct. 1431, 1436 (1986) ("[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.").

## C.    Harmless Error

Here, the government has met its burden to show that this error as to Count 3 was harmless.  If Hobbs Act robbery conspiracy were the only predicate for the defendants' § 924(c) firearm convictions, their convictions would be invalid and would have to be vacated under Davis.  But it wasn't.  The other predicate was the still-valid cocaine conspiracy crime.  Thus, there remains a valid predicate to support the defendants' § 924(c) convictions.

That alone does not end our harmless-error inquiry.  The defendants argue that the jury may have unanimously found the guns connected to the invalid Hobbs Act robbery conspiracy but not to the still-valid cocaine conspiracy.  Because there was a general verdict, the defendants argue it is impossible to tell if the jury unanimously agreed the guns were connected to the cocaine conspiracy.  We disagree because the trial record makes clear that the two predicate conspiracy crimes were so inextricably intertwined that no rational juror could have found that Cannon and Holton carried a firearm in relation to one predicate but not the other.

First, the indictment itself indicates the two conspiracies were intertwined

41

and coextensive.  Count 1 charged that, between June 22, 2015, and November 13, 2015, Cannon, Holton, and Stubbs conspired to rob narcotics traffickers of their cocaine.  Correspondingly, Count 2 charged that, during that same time period, the same three defendants also conspired to possess the same controlled substance, cocaine, with the intent to distribute it.

Second, the jury found Cannon and Holton guilty of both the underlying Hobbs Act robbery conspiracy charged in Count 1 and the underlying cocaine conspiracy charged in Count 2.  The jury's guilty verdicts on both Counts 1 and 2 conclusively establish that the jury unanimously found beyond a reasonable doubt that the defendants were conspiring to rob the stash house of cocaine so they could then possess and distribute the cocaine themselves.

Third, while the two conspiracies had different elements, the trial evidence established the same facts and time period underlying each crime.  The cocaine the defendants were planning to rob from the narcotics traffickers was the same cocaine they were planning to possess with the intent to distribute.  Undisputedly, the goal of the robbery scheme was to steal cocaine from a stash house so they could then distribute it themselves.  And, on the day of the planned stash house robbery, the defendants brought firearms to the prearranged meeting place because they intended to use those firearms to take the cocaine from the armed guards at the stash house.  In other words, the defendants brought the firearms

42

simultaneously to rob the narcotics traffickers of cocaine and to take possession of the cocaine. No reasonable juror could have found that Cannon and Holton carried their firearms in relation to the Hobbs Act robbery conspiracy but not the cocaine conspiracy. We thus can confidently say, on the whole record, that the error was harmless beyond a reasonable doubt. See Neder, 527 U.S. at 15, 18, 119 S. Ct. at 1837, 1838; Van Arsdall, 475 U.S. at 681, 106 S. Ct. at 1436.

Before concluding, we review three other § 924(c) decisions where the predicates also involved Hobbs Act robbery conspiracy and drug crimes. See In re Navarro, 931 F.3d 1298 (11th Cir. 2019); In re Cannon, 931 F.3d 1236 (11th Cir. 2019); In re Gomez, 830 F.3d 1225 (11th Cir. 2016). Although these cases occurred in the § 2255 context where the defendant carries the burden, they illustrate the importance of the factual record in evaluating § 924(c) crimes after Davis.

In In re Navarro, this Court concluded that the predicate crimes "seem[ed] inextricably intertwined, given the planned robbery underlying the charge for conspiracy to commit Hobbs Act robbery was the robbery of a [fake] drug stash house." 931 F.3d at 1302 n.2. The Court held that the drug-trafficking predicates "independently supported" the defendant's § 924(c) firearm conviction because the record—the factual proffer supporting his guilty plea—established that he committed the drug crimes and carried a firearm in relation to them. Id. at 1300,

43

1302-03 (denying defendant's application to file a successive § 2255 motion).  The

Court pointed out that it was "difficult to imagine how Navarro could have

admitted facts supporting a conspiracy to commit Hobbs Act robbery without

simultaneously admitting facts supporting one or both of the drug-trafficking

crimes."  Id. at 1302 n.2.  There was no uncertainty as to which of the three

predicates underlay the § 924(c) conviction because the plea agreement and factual

proffer made clear the conviction was based on all three.  Id. at 1303 n.4.  The

Court held Navarro had not made the required "prima facie" showing on his Davis

claim.  Id. at 1303.

    In contrast, when there is only a limited record before the Court, it may be

unclear which crime served as the predicate.  For example, In re Cannon involved

ten § 924(o) predicates, including two carjackings, two Hobbs Act robberies, four

drug crimes, a drug conspiracy, and a conspiracy to commit Hobbs Act robbery.

931 F.3d at 1239, 1243.  The Court observed that "the predicate crimes seem[ed]

inextricably intertwined," but determined the defendant made a "prima facie"

showing under § 2255(h)(2) because it was "somewhat unclear," based on "the

limited record" before the Court, which crime or crimes served as § 924(o)

predicates.  Id. at 1243.  The Hobbs Act robbery and drug conspiracies had lasted

three months, and the substantive crimes were committed during home invasions

on two separate days.  Id. at 1239.  Therefore, the Court granted Cannon's

application to file a successive § 2255 motion so that the district court could review the trial record and address whether the predicate crimes were "inextricably intertwined." Id. at 1244.

Similarly, in In re Gomez, we discussed the dangers of a general jury verdict and the limited record before us and determined the defendant had made a "prima facie" showing to file a successive § 2255 motion. 830 F.3d at 1227–28. Count 5 charged that Gomez used the firearm "during two drug trafficking offenses and an attempted Hobbs Act robbery on the same day, as well as an ongoing conspiracy to commit Hobbs Act robbery that lasted two weeks." Id. at 1227. Lacking the trial record, the Court surmised that "the evidence may . . . have shown that he left that firearm at home for the drug trafficking crimes, or the attempted robbery" and may have possessed the firearm only "at some point during the Hobbs Act conspiracy." Id. At this "prima facie" stage, the Court concluded that "we can only guess which predicate the jury relied on," and that "half of the jury may have believed that Gomez used the gun at some point during his Hobbs Act conspiracy, and the other half that he did so only during the drug trafficking offense." Id. at 1226, 1228.

Here, we have a complete factual record, and the trial testimony and recordings established definitively that Cannon and Holton brought firearms in their car to the prearranged meeting place on the day of the planned stash house robbery in order to use them to steal the cocaine from the armed guards and to take

possession of the cocaine so they could distribute it themselves.  In addition, the district court instructed the jury that it "must be unanimous as to whether the United States ha[d] proven that the Defendant used or carried a firearm during and in relation to a violence crime <u>or</u> a drug trafficking crime <u>or</u> both."  Given that we must presume the jury followed the court's unanimity instruction, we know that it is not possible some of the jurors found that the defendants carried a firearm only during the Hobbs Act robbery conspiracy, while some other jurors found that they did so only during the cocaine conspiracy.[14]

In sum, the trial record makes clear the Hobbs Act robbery conspiracy predicate was inextricably intertwined with the cocaine conspiracy predicate, both of which were proven to the jury beyond a reasonable doubt.  Therefore, despite the general verdict as to Count 3, the record, as a whole, shows that the jury

---

[14]At trial, the defendants requested a special verdict as to which predicate in Count 3 or both were the basis for the § 924(c) conviction.  The defendants never claimed that Count 3 was duplicitous for charging two separate and distinct crimes in one count that must be set forth in separate counts.  For the first time on appeal, Holton claims Count 3 was duplicitous; so we review that issue for plain error.  See <u>United States v. Deason</u>, 965 F.3d 1252, 1267 (11th Cir. 2020).

A count in an indictment is duplicitous if it charges two or more separate and distinct offenses.  <u>United States v. Schlei</u>, 122 F.3d 944, 977 (11th Cir. 1997).  Holton does not explain why § 924(c) sets forth two separate and distinct crimes as opposed to one crime with alternative predicates.  And <u>In re Gomez</u> has no holding on the duplicity issue as to § 924(c).  In any event, we need not decide the duplicity issue because Holton has not shown the error, if any, was plain or that it prejudiced him.  See <u>Deason</u>, 965 F.3d at 1267-68 (stating to show duplicity error affected defendant's substantial rights, he must show there was "a reasonable probability that the jury did not unanimously" agree on a single offense).  As set forth above, the predicate crimes are so inextricably intertwined, no reasonable juror could have found the defendants carried a firearm in relation to one but not the other.

46

unanimously found that Cannon and Holton used and carried a firearm during and in relation to a conspiracy to possess cocaine with intent to distribute, a drug trafficking crime unaffected by <u>Davis</u>.  Thus, the government has carried its burden of showing harmless error.  Accordingly, Cannon and Holton's challenge to their § 924(c) convictions on Count 3 fails.

## X.  CONCLUSION

For the reasons above, we affirm Cannon's and Holton's convictions and sentences.