[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-12623

_____

D.C. Docket No. 1:15-cr-00213-ELR-LTW-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CRAIG ALAN CASTANEDA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(May 19, 2021)

Before WILLIAM PRYOR, Chief Judge, LUCK, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

This is another of those cases where a defendant propositions someone on the internet in an attempt to sexually abuse a child, only to discover too late that the person on the other end of the conversations is a law enforcement agent. See, e.g., United States v. Deason, 965 F.3d 1252, 1256 (11th Cir. 2020).

Craig Castaneda was convicted of attempted enticement of a minor to engage in unlawful sexual activity and traveling across a state line with the intent to engage in sexual activity with a person under the age of 12 years. He was sentenced to 420 months imprisonment. This is his appeal of those convictions and sentence.

I.

Castaneda, who lived just south of San Diego, California, saw a Craigslist ad from someone claiming to live in Atlanta, Georgia. The ad stated that it was posted by a 37-year-old female with a 9-year-old child who was: "Looking for someone with experience with REAL Taboo to be a good teacher! If you know what i'm [sic] talking about reach out. . . . [N]o experience, don't bother!!!"

Castaneda reached out. He began communicating with someone going by the name of "Kandi," first by email and then by another messaging application. Castaneda's first two emails to "Kandi" claimed that he was "experienced in what you're looking for," meaning he had experience in "[i]ncest, pedophilia and grooming" and "[e]xperience with my friend's daughter (started at 4), and several

2

younger cousins growing up." He also stated that although he was "currently in California, [he] could definitely make a visit [to Atlanta] for in person instruction." "Kandi" confirmed they were "on the same page," that she had a 9-year-old daughter, and that she was "wanting to learn more and looking for someone with experience like you."

Castaneda responded with a lengthy "first lesson" about how to sexually abuse children; part of that "lesson" was the warning to "[b]e smart about how you engage in this, the wrong move will lose you your daughter and put you on a sex offender list, it'll wreck your life." He reaffirmed that he was "willing to come to Atlanta" and asked for more information about "Kandi's" daughter.

Castaneda soon began planning to fly from California to Georgia to help "Kandi" sexually abuse the 9-year-old girl. As part of his planning, he asked "Kandi" what "activity [the daughter] would love to do," meaning "[s]omething she will like, but not get to do often, like the zoo." Castaneda asked that because he wanted to build trust and develop a good relationship with the little girl and use it, in his words, "to break the ice." He also instructed "Kandi" that her "job with [the daughter] at this stage is to build [Castaneda] up" and to let her daughter know that his "visit and everything going well is VERY important to you personally and you need her to be on her best behavior and do her best to contribute to my visit being a success." Another part of Castaneda's planning was telling "Kandi" that

3

on the first visit "there will likely be no penetration" of the child's vagina because that might hurt the child and that is "just one of those things they need to be worked into." Soon after that, Castaneda bought a plane ticket to Atlanta.

As it turned out, of course, "Kandi" was not the mother of a 9-year-old girl, nor was there one. Instead, Castaneda was communicating with an undercover law enforcement agent who had posted the Craigslist ad and was posing as "Kandi."

Castaneda did not know that when he boarded a plane for Atlanta. In fact, on the day his flight was scheduled he sent "Kandi" a message instructing her about some items he wanted her to bring to their meeting, which was to take place in the downtown area near a hotel where Castaneda had booked a room for two nights. The items he wanted her to bring were "swim clothes and maybe a small pocket rocket," which is a sexual vibrator device, an additional sexual vibrator device that Castaneda requested be "a smaller, smooth, non-phallic vibe," and sexual lubrication. He also instructed "Kandi" to wear her "Sunday best sort" of clothes. When Castaneda got off the plane in Atlanta, he was arrested.

Castaneda was indicted for one count of attempting to entice a minor to engage in unlawful sexual activity, in violation of 18 U.S.C. § 2422(b), and one count of crossing a state line with the intent to engage in sexual activity with a person under the age of 12 years, in violation of 18 U.S.C. § 2241(c). A jury found

4

him guilty on both counts. The district court sentenced Castaneda to 420 months imprisonment.

## II.

Castaneda contends that his indictment should have been dismissed because the government's conduct in investigating him was so outrageous that it violated his Fifth Amendment due process rights.

The theory behind the outrageous government conduct defense is that if a defendant can show that the "law enforcement[] techniques [used] violate 'fundamental fairness, [and are] shocking to the universal sense of justice, mandated by the Due Process Clause of the Fifth Amendment,'" United States v. Cannon, 987 F.3d 924, 941 (11th Cir. 2021) (quoting United States v. Russell, 411 U.S. 423, 432 (1973)), that ought to "bar the government from invoking judicial processes to obtain a conviction," Russell, 411 U.S. at 431–32.

Outrageous conduct is only a potential defense in this circuit because neither the Supreme Court nor this Court has ever found it to actually apply and barred the prosecution of any case based on it. See Cannon, 987 F.3d at 941–42 (noting that "this defense has never succeeded here or in the Supreme Court" and that some of our cases "state that because this Court has never actually reversed a conviction based on outrageous government conduct, any discussion of it is merely dicta"); United States v. Jayyousi, 657 F.3d 1085, 1111 (11th Cir. 2011) ("We have never

5

applied the outrageous government conduct defense and have discussed it only in dicta."); United States v. Sanchez, 138 F.3d 1410, 1413 (11th Cir. 1998) ("While the Supreme Court and this Court have recognized the possibility that government involvement in a criminal scheme might be so pervasive that it would be a constitutional violation, that standard has not yet been met in any case either before the Supreme Court or this Court.").  Like the fabled creature Sasquatch, this defense has entered the common consciousness and is mentioned from time to time.  Some claim to have caught fleeting glimpses of it in the remote backwoods of the law, but its actual existence has never been confirmed.

The invariable way that consideration of an outrageous government conduct defense has ended in the Supreme Court and in this Court is illustrated by what the Supreme Court stated in its Russell decision: "While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, the instant case is distinctly not of that breed."  Russell, 411 U.S. at 431–32 (citation omitted).  And neither is this case.

Castaneda contends that the government acted outrageously by exposing him to child pornography in the course of its sting operation.  Here's how Castaneda says that he was "exposed" to child pornography.  At one point during the

6

government's undercover messaging with him, Castaneda requested a picture of "Kandi," the fictional mother of the fictional child he was planning to actually sexually abuse if he could. The agent communicating with Castaneda responded to his request for a picture of the mother by providing him with a link to a public "MeetMe.com" online profile for Katrina Cox. Cox was a previously convicted child pornographer cooperating with the government by allowing agents to use her online identity and some of her accounts.

When he received the link to the profile for Cox, Castaneda decided not just to look at her picture or communicate with her, but to go further. He decided to use the information from Cox's MeetMe.com profile to see what else he could find. What he managed to find was a different website that listed an email address similar to the one he had for "Kandi" as well as the password to that other email address. Castaneda then used that information to log into the email account using Cox's password, and on that website he found child pornography. Castaneda made that discovery while he was at work. He didn't discard that child pornography but instead downloaded it to his personal computer when he got home.

Castaneda moved to dismiss the indictment on outrageous government conduct grounds. At a hearing on the motion, the government agents involved in the undercover operation testified that: they had never come across, or heard of, the email account that Castaneda had hacked into; they had never suggested to

7

Castaneda he should hack into that email account or any other account; they had never provided him with the password to that or any other email account, or with permission to go into anyone's email account; and they had not suggested to Castaneda where he might find child pornography.

The magistrate judge issued a report that expressly found the testimony of the agents to be credible and recommended that the motion to dismiss the indictment be denied. As the government points out, Castaneda failed to object to that part of the report. The district court "conducted a de novo review of those portions of the [report] to which [Castaneda] object[ed] and [it] reviewed the remainder of the [report] for plain error." Under that standard of review, the court adopted the report and recommendation in its entirety and denied the motion to dismiss. Even though Castaneda did not object to the magistrate judge's conclusions about outrageous government conduct, he did not forfeit his right to challenge the ruling on appeal because the magistrate judge did not inform him of the consequences of failing to object to the report's legal conclusions. See Harrigan v. Metro Dade Police Dep't Station #4, 977 F.3d 1185, 1191–92 (11th Cir. 2020); 11th Cir. R. 3-1. In any event, his challenge fails on the merits.

"Generally, the district court's denial of a motion to dismiss an indictment is reviewed only for an abuse of discretion." United States v. McPhee, 336 F.3d 1269, 1271 (11th Cir. 2003). But we have said that "[w]e review de novo the

denial of a motion to dismiss based on outrageous government conduct." Cannon, 987 F.3d at 941 n.6; see also United States v. Savage, 701 F.2d 867, 868 n.1 (11th Cir. 1983) (explaining that whether the government's conduct violated a defendant's due process rights "is a question of law"). Any associated factfindings, however, are reviewed only for clear error. See United States v. Trainor, 376 F.3d 1325, 1329 (11th Cir. 2004). Credibility findings get particularly deferential treatment, and we accept them unless no reasonable factfinder could. United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002).

The district court did not err in denying Castaneda's motion to dismiss the indictment. No law enforcement agent instructed or encouraged Castaneda to hack into any email account, particularly one containing child pornography. No agent instructed or encouraged Castaneda to download child pornography onto his home computer. No agent exposed Castaneda to child pornography. He exposed himself to it. And he put it on his home computer where he could expose himself to it again and again in the future. As the government aptly argues in its brief:

> Castaneda invokes the inapplicable tort doctrine of "danger invites rescue," originally recognized in Wagner v. Int'l Railway Co., 133 N.E. 437 (N.Y. 1921) (Cardozo, J.), to argue the government forced his hand. But another tort doctrine from a Cardozo case, the famous Palsgraf decision, is far more instructive: the proximate cause of Castaneda's exposure to child pornography is not any law enforcement officer's action, but his own intervening decision to hack a private email account and examine its contents. See Palsgraf v. Long Island R. Co., 162 N.E.

9

99, 101 (N.Y. 1928) (Cardozo, C.J.); id. at 103–04 (Andrews, J., dissenting).

Br. of Appellee at 36 n.5.  We agree.

As for law enforcement's generic sting operation of posting a Craigslist ad and communicating with Castaneda about his desire to abuse a child, there is no legal basis for challenging as outrageous those commonplace, and common sense, tactics.  See, e.g., Deason, 965 F.3d at 1256; United States v. Gillis, 938 F.3d 1181, 1187–89 (11th Cir. 2019); United States v. Stahlman, 934 F.3d 1199, 1205–07 (11th Cir. 2019); United States v. Jockisch, 857 F.3d 1122, 1124–25 (11th Cir. 2017).

Given that the conduct of the government agents in this case was anything but outrageous, we affirm the denial of Castaneda's motion to dismiss the indictment on outrageous conduct grounds.  The hunt for Sasquatch will have to continue in another case.

## III.

Castaneda also contends that evidence of child pornography contained on five of his computers should have been suppressed.  Though Castaneda was not indicted for or convicted of possession of child pornography, evidence that he possessed it was used at trial to help prove his intent.

After Castaneda was arrested, he allowed two of his friends, Yolanda Cooley and Casey Cousins, to live in his condominium in California.  While they were

10

living there with Castaneda's permission, about two months after his arrest, Cousins inadvertently discovered child pornography on one of Castaneda's computers that was in the living room.  Cousins discovered it after downloading a television show to the computer; when he went into the part of the computer containing downloaded files, he saw a file with "12-year-old" in the title.  He opened that file, a video, saw that it was child pornography, and then he closed the video, "[t]urned off the computer, unplugged it, set it in the corner, and called Ms. Cooley immediately."  Cousins and Cooley decided to inform FBI agents and turn over to them that computer, along with the four others that were in Castaneda's condo.  They made that decision out of concern that if they kept the computers, they might be subject to prosecution for possessing child pornography.

Cooley, who had been interviewed by FBI Agent Brian Hamilton shortly after Castaneda's arrest, still had his contact information and used it arrange a meeting with him.  At that meeting with Hamilton and another FBI agent, Cooley gave them all but one of the five computers.  She had forgotten that one, but Cousins gave it to Agent Hamilton a few days later.  After receiving the five computers, Agent Hamilton shipped them to FBI agents in Atlanta, who then obtained a warrant to search all of them, and on two of the computers found hundreds of images and videos of child pornography.

11

Castaneda moved to suppress that evidence of child pornography. At the hearing on that motion, Cousins and Cooley both testified that no FBI agents had ever asked them to search Castaneda's computers or do anything else to investigate him. Likewise, Agent Hamilton testified that he had never asked Cooley for assistance with investigating Castaneda and that he had never spoken to Cousins before Cousins discovered the child pornography.

The magistrate judge issued a report recommending that the motion to suppress be denied. The report recommended the district court find that Castaneda had abandoned his arguments for suppression by failing to perfect them in post-hearing briefing. It also recommended that even if the court considered Castaneda's "unperfected suppression motion, it would likely fail on the merits." That was so, the magistrate judge reasoned, because "[t]he Fourth Amendment does not prevent unreasonable searches by private citizens," like Cooley and Cousins, who had not been encouraged by law enforcement to search the computers or play any part in doing so. The magistrate judge expressly found that "Cooley and Cousins credibly testified that they turned over the computers to the FBI on their own initiative [and] for their own purpose because they were afraid that they could be vulnerable to prosecution for their continued possession of the computers in the residence." And Agent Hamilton "credibly testified that he never

asked Cooley to search any of [Castaneda's] electronic devices and never asked for Cooley's assistance in the investigation."

The magistrate judge's report also recommended that the district court reject Castaneda's argument that there was no probable cause to search the computers, because "Cousins was an eyewitness as to the illicit contents on [Castaneda's] computer and there is no known motivation for [Cousins] to lie about what he found." The district court overruled Castaneda's objections to the report and recommendation, adopted it, and in that manner denied the motion to suppress.

Castaneda contends that the district court should have granted his motion to suppress the evidence of child pornography found on his computers. The government counters that Castaneda forfeited the suppression issue by not objecting to that part of the magistrate judge's report and that, in any event, none of his arguments for suppression has any merit. As mentioned, Castaneda did not forfeit the issue because the magistrate judge did not inform him of the consequences of failing to object to the legal conclusions in the report. See Harrigan, 977 F.3d at 1191–92; 11th Cir. R. 3-1. But the government is correct that Castaneda's arguments have no merit.

Castaneda's position is twofold. First, he argues that "[a]ny 'voluntary' surrender of Castaneda's computers by Cousins or Cooley, and any purported consent [he gave them] to search, was an insufficient basis to permit their search

13

and seizure" because Castaneda had "revok[ed] any authority Cousins may have had to surrender" them because he instructed Cousins not to give the computers to law enforcement without first talking with Castaneda's attorney. According to Castaneda, "[b]ecause [he] held an expectation of privacy in the computers, any action contrary to his wishes with respect to them lacked effective consent." He apparently means that because he did not want the FBI agents to have and search his computers and never consented to the agents doing so, Cousins and Cooley violated his constitutional rights when they handed the computers over to the agents. In other words, he asserts that the evidence should be suppressed because, based on Cooley's and Cousins' actions, the FBI agents unlawfully acquired the computers in the first place.

The Fourth Amendment "is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official." United States v. Jacobsen, 466 U.S. 109, 113 (1984) (quotation marks omitted); accord United States v. Steiger, 318 F.3d 1039, 1045 (11th Cir. 2003) ("A search by a private person does not implicate the Fourth Amendment unless he acts as an instrument or agent of the government."). Law enforcement agents may use in an application for a search warrant information that is given to them by a private party even if that private party unlawfully obtained the information. See Steiger, 318

14

F.3d at 1041–46 (affirming the denial of a suppression motion when the search warrant "was based in part on information from an anonymous source who hacked into [the defendant's] computer," found child pornography, and informed law enforcement); see also Burdeau v. McDowell, 256 U.S. 465, 474–75 (1921); United States v. Mekjian, 505 F.2d 1320, 1327 (5th Cir. 1975) ("Burdeau . . . has made it clear that the fourth amendment was intended as a restraint on the activities of the government and its agents and is not addressed to actions, legal or illegal, of private parties.") (emphasis added) (citation omitted).[1]  Agents also may "seize" property that a non-owner private party has voluntarily relinquished to them when probable cause exists to believe that the property contains contraband.  See Jacobsen, 466 U.S. at 120–22 (noting that a "seizure was not unreasonable" when law enforcement agents asserted "dominion and control over the [defendant's] package and its contents" that had been searched by a private party because "it is well settled that it is constitutionally reasonable for law enforcement officials to seize 'effects' that cannot support a justifiable expectation of privacy without a warrant, based on probable cause to believe they contain contraband").

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

Cooley and Cousins were both "private individual[s] not acting as . . . agent[s] of the Government or with the participation or knowledge of any governmental official," making the Fourth Amendment "wholly inapplicable to a search or seizure, even an unreasonable one, effected by" them. Id. at 113 (quotation marks omitted). When Cousins inadvertently discovered the child pornography he was not acting as a government agent but was simply a private individual trying to watch a TV show. And when Cooley and Cousins took the computers to Agent Hamilton, they were not acting as government agents but as private individuals. They turned the evidence over to the government on their own initiative out of a desire not to be caught up in any of Castaneda's criminal activity themselves. The two of them and Agent Hamilton unequivocally testified to these facts, and the magistrate judge unequivocally credited their testimony. We defer to those credibility determinations. See Ramirez-Chilel, 289 F.3d at 749.

Because any actions taken by Cooley and Cousins were done as private individuals and not as government agents, whether Castaneda consented to those actions makes no difference. Castaneda's reliance on "consent" is reliance on a "Fourth Amendment principle[] governing searches and seizures [that] appl[ies] only to 'governmental action,'" not to the private action taken here. United States v. DiTomasso, 932 F.3d 58, 67 (2d Cir. 2019) (quoting Jacobsen, 466 U.S. at 113). And even if the FBI agents "seized" the computers when Cooley and Cousins

16

voluntarily handed them over, Castaneda's consent was not needed for that seizure. See Jacobsen, 466 U.S. 120–22; see also Coolidge v. New Hampshire, 403 U.S. 443, 487–90 (1971). Nor was Castaneda's consent needed for the FBI agents to obtain a search warrant based on information provided by Cousins and Cooley. See Steiger, 318 F.3d at 1041–46. Castaneda's consent is irrelevant across the board.

Once the FBI agents had the five computers from Castaneda's condominium, they obtained a search warrant to search them for child pornography, and found it on two of them. Castaneda's second argument in favor of suppression is that the search warrant was not supported by probable cause. The affidavit on which the warrant was based recounted, among other facts, Cousins' detailed firsthand account of finding child pornography on Castaneda's computer, including a description of the video he saw. That was enough to provide probable cause to believe that there was child pornography on that and the other computers Castaneda had left in his condominium. Cf. Illinois v. Gates, 462 U.S. 213, 234 (1983) ("[E]ven if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case.").

17

The fact that electronic devices found on Castaneda when he was arrested did not contain child pornography does nothing to undermine the existence of probable cause. As the magistrate judge correctly pointed out: "Logically, [Castaneda] might not want to have contraband on a computer while traveling because travel often involves the presence of other people and thus, raises the risk of discovery by others or even law enforcement."

Because Cousins' discovery of the child pornography was enough to establish probable cause to search the computers, we need not address whether Castaneda's offense conduct would be enough by itself to provide probable cause to believe there would be child pornography in some of the computers he had left in the condo. The district court did not err in denying Castaneda's motion to suppress.

## IV.

Castaneda chose to testify at trial. On direct examination he testified that he was originally just role playing an online fantasy with "Kandi" and that, once he came to believe that there was a real child in danger, his intent in traveling to Atlanta was to rescue the child, not sexually abuse her. On cross-examination, the government asked Castaneda about his possession of child pornography, and in response he said that he was invoking the Fifth Amendment. After Castaneda did that, the district court told the jury that he had no valid Fifth Amendment privilege

18

under the circumstances and that because Castaneda chose to testify, he was subject "to the same rules that apply to any other witness." That meant, the court explained, that if Castaneda "has failed to deny or explain acts of an incriminating nature that the government's evidence tends to establish against him, [the jury] may consider that failure with all the other circumstances in assessing [his] credibility."

Castaneda contends that instruction was error because he did have a valid Fifth Amendment privilege. It was not, and he did not. "It has long been held that a defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination." Jenkins v. Anderson, 447 U.S. 231, 236 n.3 (1980) (quotation marks omitted); accord Kansas v. Cheever, 571 U.S. 87, 94 (2013). Castaneda testified that he was not going to Atlanta with the intent to sexually abuse a child, but to save her by going to the police there. The government argued exactly to the contrary. Castaneda's possession of child pornography on his home computers was relevant to that disputed issue because it showed that he was sexually attracted to children and liked to see them being sexually exploited and abused. See United States v. Lebovitz, 401 F.3d 1263, 1271 (11th Cir. 2005) (noting "the well-documented link between the possession of child pornography and the sexual abuse of children"). The district court did not abuse its discretion in admitting the

evidence that Castaneda possessed child pornography, in overruling his objection on Fifth Amendment grounds, or in instructing the jury that it could consider his refusal to answer questions about his possession of child pornography in assessing his credibility.

V.

Castaneda contends that the district court abused its discretion by not permitting one of his witnesses, Dr. James Herriot, to testify before the jury. Castaneda put Dr. Herriot forward as an expert in "Computer Mediated Communication (CMC) on sexual topics" who would testify that statements made over the internet "cannot be reliability [sic] taken at face value" because people sometimes create fictitious details on the internet. Dr. Herriot's report stated that he offered only "general context, cultural narrative, background, and expertise" about online communications and that he had made "[n]o analysis or recommendations regarding the specifics of this case."

The district court excluded Dr. Herriot's testimony because it had "not been shown to be relevant to this case." The court explained that: although his "report indicate[d] that he reviewed material 'related' to this case, he goes on to say that he has not made any findings or drawn any conclusions with respect to the particulars of this case, nor has he conducted any analysis or made any recommendations regarding the specifics of this case." "[A]t most," the court concluded, "Dr.

20

Herriot would only be able to provide general background information on CMC, without any specific opinion as to whether the defendant in this case acted in accordance with CMC expectations, and if so, what that means within the context of the charges in the indictment, as well as any defenses thereto." For that reason, the court found that Dr. Herriot's testimony was not relevant and would not "assist jurors in deciding the issues in the case."

We review only for an "abuse of discretion the district court's decisions regarding the admissibility of expert testimony" and we will reverse only if "the ruling is manifestly erroneous." United States v. Frazier, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc) (quotation marks omitted). "[I]t is by now axiomatic that a district court enjoys 'considerable leeway' in making these determinations." Id. (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999)).

Expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "This condition goes primarily to relevance." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 591 (1993). The question "is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." Id. (quotation marks omitted). The requirement that the testimony be helpful "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Id. at 591–92.

21

The district court acted within its discretion in excluding Dr. Herriot's testimony because that testimony was not specifically pegged to Castaneda's communications but only contained generalized background information that some people sometimes mix fact with fiction on the internet.  No juror needs expert help understanding that concept.  Everyone knows people sometimes lie and that the internet does not filter out falsehoods.

A year and a half ago this Court had before it another case in which the district court had excluded materially identical testimony from Dr. Herriot.  See United States v. Gillis, 938 F.3d 1181 (11th Cir. 2019). The defendant in that case, similar to Castaneda, had engaged in online communications with an undercover agent posing as the father of an 11-year-old daughter.  Id. at 1187–88.  That defendant's communications, like those of Castaneda's, were aimed at having sex with the young daughter.  Id.  He, like Castaneda, was convicted for, among other things, attempting to entice a minor to engage in unlawful sexual activity, in violation of 18 U.S.C. § 2422(b).  Id. at 1189.

The defendant in the Gillis case, like Castaneda, had sought to introduce expert opinion testimony of Dr. Herriot "about fantasy and role playing in online sexual communications."  Id. at 1194.  The district court in that case, like the district court in this one, sustained the government's objection under Daubert and Rule 702.  Id. at 1193–94; see Daubert, 509 U.S. at 591–93; Fed. R. Evid. 702.

22

We noted, with approval, one of the district court's findings in support of its ruling was that: "[Dr. Herriot's] primary conclusion—that not all communications on the internet are truthful—was within the knowledge of laypersons." Gillis, 938 F.3d at 1194. We agree and in this case have no trouble reaching the same conclusion that we did in Gillis. The district court did not abuse its discretion.

## VI.

Finally, Castaneda contends that his sentence of 35 years imprisonment is substantively unreasonable and that he instead should have been sentenced to the statutory mandatory minimum of 30 years. In sentencing Castaneda, the court took "into account everything that has been presented" and concluded that the 35-year sentence was justified "after considering all of the applicable sentencing factors pursuant to 18 U.S.C. section 3553(a)."

"The burden is on [Castaneda] to show that his sentence is unreasonable in light of the facts of this case and the [18 U.S.C.] § 3553(a) factors." United States v. Isaac, 987 F.3d 980, 994 (11th Cir. 2021). We review the reasonableness of the sentence only for an abuse of discretion. See Gall v. United States, 552 U.S. 38, 51 (2007); United States v. Irey, 612 F.3d 1160, 1188–90 (11th Cir. 2010) (en banc). "A district court abuses its discretion when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error

23

of judgment in considering the proper factors." Irey, 612 F.3d at 1189 (quotation marks omitted). "A district court's sentence need not be the most appropriate one, it need only be a reasonable one," id. at 1191, and the abuse of discretion standard of review "allows a range of choice for the district court," including reasonable choices that we must affirm "even though we would have gone the other way had it been our call," id. at 1189 (quotation marks omitted). The gist of it is that "[s]ubstantively unreasonable sentences are rare." United States v. Kirby, 938 F.3d 1254, 1259 (11th Cir. 2019) (quotation marks omitted).

The district court did not commit a clear error in judgment in weighing the § 3553(a) factors and sentencing Castaneda. To begin with, although we do not automatically presume that a sentence within the guidelines range is reasonable, we ordinarily expect it to be. United States v. Hunt, 526 F.3d 739, 746 (11th Cir. 2008). At 35 years, Castaneda's sentence was within the guidelines range of 30 years to life. Another indication of a reasonable sentence is that it is below the statutory maximum penalty of life imprisonment. See United States v. Gonzalez, 550 F.3d 1319, 1324 (11th Cir. 2008); see also United States v. Riley, ___ F.3d ___, No. 19-14013, 2021 WL 1653023, at *5 (11th Cir. Apr. 28, 2021) ("That an upward variance sentence is well below the statutory maximum indicates that it is reasonable.") (quotation marks omitted).

Castaneda argues that his sentence is unreasonable because no child was actually hurt or endangered. He concedes that factor is not recognized in the statute but argues it still "would have been reasonable for the court to" rely on it at sentencing. That misstates the question for us, which is whether it was unreasonable for the court not to impose a lesser sentence because of that reason. It wasn't. After all, Castaneda did everything he could to actually endanger and hurt a child. And Castaneda's argument fails to account for the impact his possession of hundreds of images and videos of child pornography had on the victims in those images and videos. See, e.g., United States v. Pugh, 515 F.3d 1179, 1194–98 & n.12 (11th Cir. 2008); see also 18 U.S.C. § 3553(a)(1)–(2).

Castaneda pleads that he will suffer enough without the sentence being five years above the statutory minimum. He will, he says, because "[p]edophiles are despised across the board," which he illustrates with the observation that "the average person" would likely say a reasonable sentence for Castaneda would be "torture[], disembowel[ment] then hang[ing]." He stresses that even "other prisoners despise pedophiles" and, he claims, routinely harass and kill them in prison. He characterizes an imprisoned pedophile's life behind bars as "truly a living hell." For all those reasons, he thinks his sentence is substantively unreasonable.

The attitude of society in general, or of prisoners in particular, toward child sex predators is not an 18 U.S.C. § 3553(a) factor that a sentencing judge must consider. The low esteem in which pedophiles are held inside and outside prison walls results from their having sexually abused children. There is no requirement that a sex predator be given dispensation in sentencing because of what he brings on himself by choosing to prey on children.

Additionally, the nature and circumstances of Castaneda's crime in this case support the lengthy sentence that was imposed. See 18 U.S.C. § 3553(a)(1). It wasn't an impulsive spur-of-the-moment crime. Castaneda trolled the internet looking for child victim opportunities. While in San Diego he found an ad posted in a section of Craigslist that was designated for the Atlanta area. He meticulously planned a trip across the country, some 2,100 miles, for the sole purpose of sexually abusing a 9-year-old girl. His planning and preparation included grooming the intended victim to gain her trust and instructing her "mother" how to assist him in the effort. Not only that, but Castaneda also possessed hundreds of images and videos of child pornography, which were not even included in the charges against him.

His history and characteristics further support the reasonableness of the 35-year sentence. See 18 U.S.C. § 3553(a)(1). There was evidence from Castaneda himself that he had previously abused children. He told the undercover law

26

enforcement agent posing as "Kandi" that he had abused children in the past, including one as young as 4 years old. That four-year-old, he added, was his friend's daughter, and he described how he had groomed her and kept her from telling others. In addition to those statements from Castaneda himself, at the sentence hearing a law enforcement agent testified that Castaneda had messaged with a 13-year-old girl on Skype and propositioned her to meet him in person, telling her he "could make it worth her while" and that she could "mak[e] some real money." That agent also testified that Castaneda had offered yet another young girl, a 14-year-old, $50 for a "cam show" in which he requested that she would be "fully nude." The government also submitted to the court exhibits evidencing those communications.

There is another circumstance that entered into the district court's sentence decision. The court had initially thought that a sentence of the mandatory minimum 30 years might be sufficient, but Castaneda's demeanor and continued excuses for his criminal behavior were troubling enough to change the court's mind. The court stated that it couldn't help but be troubled by the position Castaneda took throughout the trial and in a letter he wrote to the court before sentencing claiming that he had not done anything criminal but instead was "just role-playing."

And then there was his demeanor, which conveyed his attitude. The court pointed out "the look that you're giving me now, which you had on your face throughout the government's presentation, almost like you're confused about what everybody is saying about you here." There is no wonder that Castaneda's failure to accept responsibility and his demeanor were "very puzzling and troubling" to the court in light of the evidence presented at trial and the jury's verdict. Cf. Isaac, 987 F.3d at 996 (holding that "[t]he court appropriately considered" that the defendant may not have understood the severity of his crimes or been remorseful).

**AFFIRMED.**