[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-11704

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

DARICK DEWAYNE DILLARD,

Defendant- Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 2:21-cr-00029-KD-B-1

_____

2                    Opinion of the Court                    22-11704

_____

No. 22-11705

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

DARICK DEWAYNE DILLARD,
LAMETRIUS DILLARD,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 2:21-cr-00066-KD-B-1

_____

Before NEWSOM, BRANCH, and GRANT, Circuit Judges.

PER CURIAM:

Siblings Darick Dillard and Lametrius Dillard appeal their respective convictions following their trial in the Southern District of Alabama. The jury convicted Darick of two counts of possession of a firearm by a convicted felon, one count of possession with intent to distribute a controlled substance, and one count of possession of a firearm in relation to a drug-trafficking crime. The jury convicted Lametrius of witness tampering.[1]  On appeal, Darick argues that the district court erred in denying his motion to dismiss the indictment based on outrageous governmental conduct. Lametrius argues that there is insufficient evidence to support her conviction for witness tampering and that the district court abused its discretion in admitting an unauthenticated Facebook post at trial. After review, we affirm.

## I.    Background

In February 2021, a federal grand jury indicted Darick on two counts of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g), based on his sale of firearms to a confidential informant ("CI"), Sarah Turner. Later, Darick and his sister, Lametrius, were indicted in a separate case on charges of (1) possession with intent to distribute less than 500 grams of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Darick only), (2) possessing a firearm during and in relation to a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)

---

[1] The jury also convicted Darick of witness tampering, but his post-verdict motion for judgment of acquittal was granted as to that count.

(Darick only), and (3) witness tampering, in violation of 18 U.S.C. § 1512(b)(1) (both Darick and Lametrius).

Darick filed a motion to dismiss the indictment in the first case (charging him with two counts of possession of a firearm by a convicted felon), arguing that "the Government violated the law by using a convicted felon to conduct the controlled buys" that formed the basis of the charges. He conceded that he could not "find any case in support of [his] argument," but maintained that the indictment should still be dismissed. The district court denied the motion in an endorsed paperless order.

Thereafter, the district court consolidated the two cases, and Darick and Lametrius proceeded to trial. At trial Michael Kiser, a sheriff with Alabama's Dallas County Sheriff's Department, testified that he had known Sarah Turner, a CI, for "five or six years," and she had reliably provided tips on narcotic activity in the Selma, Alabama, area. In May 2020, Turner approached him and stated that Darick "was a menace to her area," because he was involved in drug and firearm activity in her neighborhood, and she wanted "to help get [him] off the street." Kiser investigated and corroborated the information Turner provided. He then arranged for Turner to purchase firearms from Darick through controlled buys on two separate occasions. When officers arrested Darick at his home for the firearm transactions, they discovered large amounts of marijuana, crack cocaine, powder cocaine, and methamphetamine, and digital scales. Officers also discovered a loaded firearm under Darick's bed.

Kiser admitted that he discovered that Turner was a convicted felon shortly before the trial. Kiser explained that he conducted background checks on CIs; however, he only checked the state database for convictions, which did not reveal Turner's federal felony conviction.[2]

During the course of the trial, the government introduced a recorded jail call between Darick and his sister, Lametrius, from the day of Darick's arraignment. During the conversation, Darick denied selling a firearm and said, "that's why I need you to go down to [Turner], because I need to see what the hell [Turner] and them got going on, cause [Turner] knows that I ain't never sold them no gun." Darick stated that Arthur Harris ("Arthur"), his nephew, had sold Turner the gun. Darick stated "[s]o, shit, they need to get that shit together. Because [Turner] or somebody's telling lies. They know I ain't sell 'em, cause Arthur sold them that gun." He then reiterated to Lametrius that he needed her to "go by there and holler at [Turner], ask [Turner] what the hell's going on. Because I think her son probably got caught with the gun and they probably said that I was, because Arthur was with me. But . . . Arthur's the

---

[2] Turner testified that in 2009 she was convicted of stealing money from the United States. She explained that, at that time, she lived in Section 8 housing and when she got a job, she did not report it. Thus, she was convicted of stealing money from the government in the form of unpaid rent. Turner erroneously believed that she could possess a firearm after five years from the date of conviction. She did not remember whether she reported being a convicted felon on her CI application, but she "assum[ed] they knew about it" because they did a background check.

6                    Opinion of the Court                    22-11704

one [who] went around there and sold the gun.  I didn't sell [Turner] no gun."  He continued, "you need to go there—you need to go ask her.  You need to see.  Because that shit ain't gonna fly with me, because [Turner] know I ain't sold her nothing." Lametrius told Darick that she was "headed over there now." Darick continued, telling Lametrius that "Arthur knows for hisself [sic] that he sold that gun to [Turner].  You need to go by there and tell [Turner] the truth—because she knows the truth."  "Go over there, holler at [Turner].  See what she said.  Because let her know that they called, like she's the one saying that I—I ain't sold [Turner] shit."[3]

Following the call, Lametrius went to Turner's home.  The government introduced a recording of the conversation that took place between Turner and Lametrius.

> [Lametrius]: [Darick] said they said something about you had put—said that your boyfriend or somebody got caught with a—some .22 and said that you signed the thing and said he sold you a gun.  He said he ain't sold you no gun.
>
> . . .
>
> Something about he said he don't know what going on or what done happened but he said somebody put it in writing, said it came from you—that your—

---

[3] In other recorded calls between Darick and other individuals that were introduced at trial, Darick referred to Lametrius as "his muscle."

somebody sold you a .22 gun.  A pistol.  He said he ain't sell you no damn gun.

[Turner]:  I don't even know what y'all talking about no—huh-uh.

. . .

[Lametrius]:  They had called, something about talking about they indicted him for and said that you said that your—somebody got caught with a gun or you had the gun in your car.  I don't know who—I don't know what it was.  I don't know how the incident came up.  But [Darick]—he ain't sell you no gun.  But he said you put it in writing that he sold you a pistol.

[Turner]:  Ain't put nothing in no writing.  I don't even know what you talking about.

[Lametrius]:  Huh?

[Turner]: Who I need to call?

[Lametrius]:  I don't know who you need to—they need to call somebody 'cause [Darick] said I know [Turner] ain't told nobody no shit like that.  He say Arthur had sold her a gun one time.  He ain't had shit to do with nobody selling you no gun or buying no gun from—for—you know, from him.

Turner continued to deny knowing what Lametrius was talking about, but Lametrius continued to ask Turner whether Darick sold her a gun.  Lametrius also asked Turner why she would "put something in writing saying that [Darick] sold [her] a gun [when]

you sitting here telling me you don't know nothing about it and you ain't sold him nothing." Turner stated that she was "not trying to get caught up in no bullshit like this" and would "straighten it out." Lametrius responded, "No. It ain't that you trying to get caught up in none of that. Tell the truth. If [Darick] ain't sold you no pistol, just tell them folks straight." She reiterated "I'm just going to be honest because I'm for real . . . ain't nobody got time for that shit. These folk plotting and telling folks—telling lies and stuff, now. Tell the truth. You understand what I'm saying." Turner denied that Darick sold her a gun, and she told Lametrius that she would call someone and fix the situation.

Turner testified that the conversation with Lametrius made her feel "scared" because Lametrius referenced "Arthur," and Turner knew that Arthur was dead. Turner "was kind of scared that somebody was going to kill [her]" and confirmed that she was intimidated by the conversation with Lametrius. She confirmed that Lametrius made it clear that she wanted Turner to lie and tell the police that Darick did not sell her the gun. Turner contacted Kiser after Lametrius's visit, and they moved Turner out of Selma for her safety.

Sometime after the conversation with Lametrius, Turner saw a Facebook post from Lametrius that implicated Turner's involvement as a CI. Turner took a screenshot of the post and sent it to Kiser. Turner testified that she recognized the post as Lametrius's because the post contained Lametrius's name and likeness in the upper left-hand corner, and she was friends on

Facebook with Lametrius at the time. The government then offered the screenshot of the Facebook post into evidence.

Lametrius objected to the admission of the post as "hearsay without any proper predicate," and argued that Turner "lack[ed] foundation to determine whether or not [Lametrius] had sent it." She also argued that the evidence was more prejudicial than probative and should be excluded under Federal Rule of Evidence 403. The district court overruled her objections without explanation, and the post was admitted. The post stated:

> How many more people paperwork she's on????? If any of y'all been involved with Sarah Turner she working for CIS Snitching she have been recording Darick Dillard for 9 months she's all over his paper Murder Mill than run club 27 it's real she's Working for the Feds thank it's a joke I have proof but God has the last say so!!!! Rat[t]ing on people video recording pictures taking be careful out their y'all she's snitching posting truth in Jesus name.

The post also contained two photographs of Turner. Turner testified that she was terrified and thought that Lametrius was "put[ting] [her] out there so somebody [could] actually kill [her] or something." On cross-examination, Turner confirmed that, although the Facebook post was made on Lametrius's Facebook account, Turner had no way to confirm that Lametrius actually made the post.

At the close of the government's case-in-chief, both Darick and Lametrius rested and moved for a judgment of acquittal on all charges.  In particular, Lametrius argued, as to her sole charge of witness tampering, that she asked Turner to "tell the truth" and that her actions did not rise to the level of witness tampering.  The district court took their motions for judgment of acquittal on the witness tampering charge under advisement.  Following closing arguments, the district court denied the motions, noting that the court needed "research and case law" on the issue, which counsel was not prepared to provide at that time.  The district court noted that, if the jury returned a guilty verdict, then the defendants could reargue the motion.

Following deliberations, the jury convicted Darick and Lametrius as charged.  Lametrius did not renew her motion for a judgment of acquittal.  Darick, on the other hand, filed a renewed motion for judgment of acquittal on all counts.  With regard to his conviction for possession of a firearm by a convicted felon, he argued in relevant part, that because Turner was a convicted felon, it was illegal for her to possess a firearm, and, therefore, the government could not obtain a conviction against Darick based on Turner's alleged purchase of firearms from him.  The district court denied his motion as to his conviction for being a felon in possession of a firearm, but granted the motion as to his conviction for witness tampering.  The district court sentenced Darick to a total of 147 months' imprisonment, followed by 5 years' supervised release.  It sentenced Lametrius to 12 months' imprisonment,

followed by 3 years' supervised release.  Darick and Lametrius both timely appealed, and we consolidated their appeals.

## II.    Discussion

A.  *Whether the district court erred in declining to dismiss the indictment charging Darick with two counts of possession of a firearm by a convicted felon*

Darick raises one issue on appeal.  He argues that the district court erred in declining to dismiss the indictment based on the government's "outrageous conduct" of failing to properly investigate Turner's background, which resulted in the government's use of a convicted felon as a CI to purchase firearms from him—items which the CI could not legally possess.  He maintains that the government's conduct was so outrageous that it violated his Fifth Amendment due process right to "fundamental fairness within the executive and judicial process[es]."[4]

"[W]e review *de novo* the denial of a motion to dismiss based on outrageous government conduct." *United States v. Castaneda*, 997 F.3d 1318, 1325 (11th Cir. 2021) (quotation omitted).  As we previously explained,

---

[4] The government suggests in passing that Darick's "barebones motion in the district court" may not have adequately preserved the issue, but it also notes that we "need not linger" on this issue because his claim fails on the merits. Because the government did not fully brief the preservation issue and we conclude that the claim fails on the merits, we find it unnecessary to reach the preservation question.

> [o]utrageous government conduct is a potential defense that focuses on the tactics employed by law enforcement officials to obtain a conviction for conduct beyond the defendant's predisposition.  It is based on the Supreme Court's recognition of the possibility that law enforcement's tactics may be so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.  To establish outrageous government conduct, a defendant must show that law enforcement's techniques violate fundamental fairness, shocking to the universal sense of justice, mandated by the Due Process Clause of the Fifth Amendment.

United States v. Cannon, 987 F.3d 924, 941 (11th Cir. 2021) (quotations and internal citations omitted).  Importantly, "[o]utrageous conduct is only a *potential* defense in this circuit because neither the Supreme Court nor this Court has ever found it to actually apply and barred the prosecution of any case based on it." Castaneda, 997 F.3d at 1324 (emphasis added); United States v. Jayyousi, 657 F.3d 1085, 1111 (11th Cir. 2011) (noting that "[w]e have never applied the outrageous government conduct defense and have discussed it only in dicta").

Although we have yet to apply the doctrine, we have determined that "the actionable government misconduct must relate to the defendant's underlying or charged criminal acts. Outrageous government conduct occurs when law enforcement

obtains a conviction for conduct beyond the defendant's predisposition by employing methods that fail to comport with due process guarantees." *Jayyousi*, 657 F.3d at 1111–12 (quotation omitted).

Darick does not allege that the government's use of a convicted felon caused him to engage in the criminal conduct in question. Instead, he merely asserts that had the police known of Turner's felon status, they would have "as a minimum, [had to] find an alternate informant without such prohibitions, or seek proper approval to use a convicted felon in a sting operation to purchase firearms." Although Darick takes issue with the fact that Turner as a felon could not lawfully possess a firearm, whether the CI could legally purchase and possess a firearm is not relevant. In short, the government's alleged misconduct did not infringe on his fundamental Fifth Amendment due process rights. Moreover, Darick has cited no legal authority for the proposition that the government is precluded from using convicted felons as confidential informants. Accordingly, the district court properly denied the motion to dismiss the indictment.

B. *Whether sufficient evidence supported Lametrius's conviction for witness tampering*

Lametrius argues that the district court erred in denying her motion for a judgment of acquittal because the evidence was insufficient to sustain her conviction for witness tampering. She maintains that in the conversation between her and Turner, she

only asked Turner to tell the truth, and the conversation was not an act of intimidation or a threat to Turner.

We review the sufficiency of the evidence to support a conviction *de novo*, considering the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the verdict. *United States v. Moran*, 778 F.3d 942, 958 (11th Cir. 2015). "We review de novo the district court's denial of a motion for judgment of acquittal, applying the same standard used in reviewing the sufficiency of the evidence[.]" *United States v. Descent*, 292 F.3d 703, 706 (11th Cir. 2002). "[W]e will not disturb a guilty verdict unless, given the evidence in the record, no trier of fact could have found guilt beyond a reasonable doubt." *United States v. White*, 663 F.3d 1207, 1213 (11th Cir. 2011) (quotation omitted).

It is illegal to use or attempt to use intimidation or threats with the intent to "influence, delay, or prevent the testimony of any person in an official proceeding." 18 U.S.C. § 1512(b)(1). "[W]hether a communication is a threat is a question of fact to be left to the [trier of fact]." *United States v. Davis*, 854 F.3d 1276, 1293 (11th Cir. 2017) (quotation omitted). "If a reasonable recipient, familiar with the context of the communication, would interpret it as a threat, the issue should go to the [trier of fact]." *Id.* (quotation omitted). The factfinder is free to conclude that the defendant intended to tamper with a witness's testimony, even if the witness did not actually feel threatened. *Id.*

Here, the superseding indictment alleged that Lametrius "did knowingly attempt to intimidate, threaten, and corruptly persuade a[n] . . . informant . . . by directing the . . . informant to say that [Arthur] sold the gun . . . ." And there was sufficient evidence to convict Lametrius of witness tampering. The government presented a recorded jail call in which Darick and Lametrius discussed that discovery in his felon-in-possession case indicated that he sold a gun to Turner. Darick denied selling the gun to Turner, and asked Lametrius to go to Turner's house to talk to her and find out "what the hell [Turner] and them got going on." He told Lametrius, "[y]ou need to go by there and tell [Turner] the truth—because she knows the truth." Following the call, Lametrius went to Turner's house and questioned Turner about whether Darick sold her a gun, explaining that Darick said Arthur sold the gun to Turner. When Turner denied knowing what Lametrius was referring to, Lametrius questioned why Turner would allegedly make a written statement if she did not know what Lametrius was talking about. Lametrius repeatedly told Turner to "[t]ell the truth" and stated "[y]ou understand what I'm saying." And Turner testified that the conversation with Lametrius made her feel "scared" because Lametrius referenced "Arthur," and Turner knew that Arthur was dead. Viewing this evidence in the light most favorable to the government, the trier of fact was free to conclude that Lametrius knowingly intended to influence or tamper with Turner's testimony. *See Davis*, 854 F.3d at 1293. Accordingly, we conclude that the evidence was sufficient to sustain Lametrius's conviction for witness tampering.

### C.  Whether the district court abused its discretion in admitting the Facebook post

Lametrius argues that the district court abused its discretion in admitting the unauthenticated Facebook post, which accused Turner of "snitching."  She maintains that the post did not satisfy Federal Rule of Evidence 901's authentication requirements, and it was unduly prejudicial because it suggested she had a propensity to intimidate.

"We review the district court's evidentiary rulings for abuse of discretion."  *United States v. Lanzon*, 639 F.3d 1293, 1300 (11th Cir. 2011).  "[E]ven if an evidentiary ruling is erroneous, it will not result in a reversal of the conviction if the error was harmless.  An error is harmless unless there is a reasonable likelihood that it affected the defendant's substantial rights."  *United States v. Langford*, 647 F.3d 1309, 1323 (11th Cir. 2011) (quotation and internal citation omitted).  Thus, "[n]o reversal will result if sufficient evidence uninfected by any error supports the verdict, and the error did not have a substantial influence on the outcome of the case."  *Id.*

We need not decide whether the district court abused its discretion in admitting the Facebook post because any error was harmless.  Based on the recorded conversations between Darick and Lametrius, and Lametrius and Turner, as well as Turner's testimony that the conversation with Lametrius scared her, the jury had more than enough evidence to convict Lametrius of witness tampering even without the Facebook post.  Accordingly,

the Facebook post did not have a substantial influence on the outcome of the case and is not grounds for reversal. *Id.*

## III.    Conclusion

Accordingly, for the above reasons, Darick and Lametrius are not entitled to relief on their claims, and we affirm their convictions and sentences.

**AFFIRMED.**